(137 P.3d 500)
No. 94,710

STATE OF KANSAS *ex rel*. PHILL KLINE, ATTORNEY GENERAL, *Appellee*, v. RICHARD L. BERRY, D/B/A CLOV LAN FARMS, LLC, *Appellant*.

Opinion filed June 23, 2006.

*John W. Gilliford, Jr.*, of The Gilliford Law Firm, Chtd., of Prairie Village, and *Michael W. Blanton*, of Swanson Midgley, LLC, of Kansas City, Missouri, for appellant.

*Joseph N. Molina*, assistant attorney general, and *Bryan J. Brown*, deputy attorney general, for appellee.

Before McANANY, P.J., MALONE and CAPLINGER, JJ.

MALONE, J.: Richard L. Berry appeals the judgment against him for violations of the Kansas Consumer Protection Act (KCPA), K.S.A. 50-623 *et seq*. Berry claims the trial court erred by granting a directed verdict in favor of the State on three separate KCPA violations. Berry also claims the trial court lacked subject matter jurisdiction to enter a judgment regarding one of the transactions.

The State brought an action against Berry for violations of the KCPA in relation to three separate transactions. The first transaction involved the sale of a horse to Raymond Sawyer. In response to Berry's advertisement, Sawyer contacted Berry looking for a trained roping horse. Sawyer went to Berry's ranch where Berry showed Sawyer a horse. According to Sawyer, Berry assured him the horse was a "finish roping horse." Sawyer did not attempt to ride the horse that day because it was sick. Sawyer returned to Berry's ranch 1 week later, but because the horse was still a little sick, Sawyer did not do any roping.

According to Berry, he told Sawyer that he probably should not buy the horse because Berry believed the horse was "too much" for Sawyer's abilities. However, Sawyer insisted on purchasing the horse, indicating his friends would teach him how to ride and rope off the horse. Berry anticipated Sawyer might want to return the horse. Thus, Berry explained to Sawyer that if the horse did not work for any reason, he had 30 days to bring it back to exchange for another horse. However, Berry would not refund his money.

On June 18, 2000, Sawyer and Berry reached an agreement whereby Sawyer paid $3,500 as a down payment for the horse and another $500 upon possession. Immediately after taking possession of the horse, Sawyer took it to an arena and attempted roping. According to Sawyer, the horse did not track the steers properly out of the gate. A couple of Sawyer's friends, who were more ex-

perienced ropers, also attempted to rope steers with the horse but had the same results as Sawyer. Sawyer returned the horse to Berry for a refund. Berry gave Sawyer a check for $4,000, but told Sawyer to hold the check for a few days because Berry needed to sell a couple of horses before the check would clear. The date on the check was left incomplete, only indicating a month and year.

According to Berry, Sawyer returned the horse because he found another horse he liked better and which was cheaper. Berry refused to refund Sawyer's money for the horse, but he did offer to sell the horse for Sawyer. Berry knew someone who would be willing to buy the horse and believed he could have the horse sold in a couple of weeks. Thus, Berry gave Sawyer the partially dated check so that Sawyer could cash it as soon as the horse was sold.

Upon return to Berry, the horse was 100 pounds underweight and within 2 weeks the horse started losing its equilibrium. The veterinarian diagnosed the horse with possum disease. The horse did not respond to treatment, and Berry had to destroy the horse. Berry's check to Sawyer never cleared the bank.

The second transaction involved the sale of a horse to Stephen and Vera Gannaway. Vera Gannaway taught horseback riding lessons. One of her students was looking for a horse that could jump and perform dressage. After seeing Berry's advertisement in the Kansas City Star, Vera Gannaway contacted Berry. Berry brought a horse to Gannaway's arena. Gannaway's student was unable to be at the arena that day; however, Gannaway and her trainer rode the horse. According to Gannaway, they walked, trotted, and cantered the horse but did not do any jumping. Gannaway believed the horse was able to jump because Berry told her a child had been jumping the horse within the last couple of years.

According to Berry, however, Gannaway and the trainer jumped the horse over 1-foot high obstacles. While Gannaway rode the horse, Berry and Gannaway's husband discussed the clicking sound that came from the horse's knees, and Berry stated this indicated arthritis. Berry also informed Gannaway about the horse's last veterinary examination with Dr. Todd Welsh. According to Berry, Welsh noted the horse had arthritis in both front legs and a right front low heel. Welsh further indicated the horse was able to do

some light riding in an arena or on grass trails and some light jumping over 1- to 1½-foot obstacles.

On August 15, 2002, Gannaway agreed to purchase the horse for $2,500. Gannaway prepared a contract which contained a veterinary inspection provision allowing Gannaway to return the horse within 30 days for a full refund if the veterinary inspection revealed any "defects, imperfections, abnormalities, deformities, irregularities, illnesses, or diseases that may inhibit or affect the health, soundness, performance ability, or resale ability of the horse."

One week later, Dr. Jon Haggard performed a veterinary inspection of the horse. Haggard determined the horse was not "vet sound," which meant the horse was not suitable for jumping. The father of Gannaway's student decided he would not purchase the horse.

Vera Gannaway attempted to contact Berry several times via telephone calls and a letter to request a refund or to renegotiate the purchase price of the horse. Berry refused to cooperate. Berry believed he had fulfilled his part of the agreement. He believed Gannaway knew of the horse's arthritis before she purchased it and was attempting to back out of the contract because Gannaway's agreement with her student fell through. Gannaway eventually sold the horse for $1,500.

A third transaction involved the sale of cattle to Firman Brandt. After seeing Berry's advertisement in the Grass & Grain magazine for the sale of 80 head of cattle, Brandt's business partner, Clint Wiese, contacted Berry. Wiese and Brandt traveled to Boonville, Missouri, to meet Berry and inspect the cattle. According to Brandt, Berry informed him that he owned the cattle they were viewing.

On May 25, 2004, Brandt paid Berry $80,000 for 80 head of cattle. According to Berry, he did not own the cattle when he showed them to Brandt; rather, Brian Ackerman owned the cattle at the time. However, Berry had an agreement to buy 250 head of cattle from Ackerman. Berry wired Ackerman $70,000 of the $80,000 Brandt had paid. However, Ackerman informed Berry that he had found another purchaser for the cattle, who was willing to

pay more money; therefore Ackerman chose not to sell the cattle to Berry. Ackerman returned the $70,000 to Berry.

Berry explained these circumstances to Brandt and offered to complete the transaction by providing 80 head of cattle from another herd which he owned near Wichita. Brandt refused the offer and demanded a refund. Berry returned $70,000 to Brandt that Berry had received back from Ackerman. However, Berry had already used the remaining $10,000 to pay off another loan. About 9 weeks after the initial transaction, Berry refunded the remaining $10,000 to Brandt, plus $300 in interest.

On September 3, 2004, the State filed a petition against Berry, alleging violations of the KCPA in relation to the three transactions. Regarding the Sawyer transaction, the State alleged Berry committed deceptive acts and practices in violation of K.S.A. 50-626(b)(1)(A), K.S.A. 50-626(b)(1)(D), K.S.A. 50-626(b)(1)(F), and K.S.A. 50-626(b)(2). The State also alleged Berry committed unconscionable acts in violation of K.S.A. 50-627(b)(1), K.S.A. 50-627(b)(3), and K.S.A. 50-627(b)(6). Regarding the Gannaway transaction, the State alleged Berry committed deceptive acts and practices and unconscionable acts in violation of the same statutory provisions as alleged in the Sawyer transaction. Regarding the Brandt transaction, the State alleged Berry committed deceptive acts and practices in violation of K.S.A. 50-626(b)(2), K.S.A. 50-626(b)(3), K.S.A. 50-626(b)(5), and K.S.A. 50-626(b)(6). The State also alleged Berry committed unconscionable acts in violation of the same statutory provisions as alleged in the Sawyer and Gannaway transactions.

The case proceeded to a jury trial. After both sides presented evidence regarding all three transactions, the State moved for a directed verdict. The trial court granted the State's motion for a directed verdict on all three transactions. On the Sawyer transaction, the trial court determined Berry committed an unconscionable act in violation of K.S.A. 50-627(b)(6). On the Gannaway transaction, the trial court determined Berry committed a deceptive act and practice in violation of K.S.A. 50-626(b)(3). On the Brandt transaction, the trial court determined Berry committed a deceptive act and practice in violation of K.S.A. 50-626(b)(2). The

trial court made no findings regarding any of the other alleged violations. The trial court granted judgment against Berry and ordered him to pay $10,000 in civil penalties for each of the three transactions. The trial court also ordered Berry to pay restitution in the amount of $4,300 to Gannaway and $16,000 to Brandt and to pay reasonable expenses and investigative fees to the State in the amount of $7,500. Berry timely appeals.

Berry claims the trial court erred by granting a directed verdict in favor of the State on all three transactions. Also, regarding the Brandt transaction, Berry claims the trial court lacked subject matter jurisdiction to consider the alleged KCPA violations because the cattle were sold in Missouri.

" 'When ruling on a motion for directed verdict, the trial court is required to resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought. Where reasonable minds could reach different conclusions based on the evidence, the motion must be denied. A similar analysis must be applied by an appellate court when reviewing the grant or denial of a motion for directed verdict.' [Citation omitted.]" *Wilkinson v. Shoney's, Inc.*, 269 Kan. 194, 202, 4 P.3d 1149 (2000).

### Brandt transaction

We will first consider Berry's claim that the trial court lacked subject matter jurisdiction to consider the alleged KCPA violations in the Brandt transaction. Berry contends the KCPA applies only to transactions that occur in Kansas. He asserts the cattle were sold in Missouri and any misrepresentation about ownership occurred in Missouri; therefore, the trial court lacked subject matter jurisdiction over this transaction.

A challenge to the trial court's subject matter jurisdiction raises a question of law. Thus, this court's scope of review is unlimited. *Morgan v. City of Wichita*, 32 Kan. App. 2d 147, 154, 80 P.3d 407 (2003).

K.S.A. 50-624(c) provides:

" 'Consumer transaction' means a sale, lease, assignment or other disposition for value of property or services within this state (except insurance contracts regulated under state law) to a consumer; *or a solicitation by a supplier* with respect to any of these dispositions." (Emphasis added.)

In *Watkins v. Roach Cadillac, Inc.*, 7 Kan. App. 2d 8, 13, 637 P.2d 458 (1981), *rev. denied* 230 Kan. 819 (1982), the defendant's car dealership was located partially in Missouri and partially in Kansas. The defendant advertised over a Kansas radio station and in a Kansas newspaper, soliciting customers to lease the defendant's vehicles. In response to the advertising, the plaintiff traveled to the dealership to discuss leasing a vehicle. The lease agreement was signed in Missouri.

The plaintiff brought a KCPA claim against the defendant arising from the lease agreement. The defendant challenged the court's jurisdiction because the lease agreement was signed in Missouri, but the plaintiff argued there was jurisdiction because the solicitation occurred in Kansas. The court construed the language of K.S.A. 50-624(c) concerning solicitation and noted: "[I]t is difficult to believe the legislature intended [to include] only solicitations which resulted in a sale or lease of property within [Kansas]. If that were the meaning intended there would be little or no need for adding the solicitation provision . . . ." 7 Kan. App. 2d at 12. The court concluded:

"We hold that under K.S.A. 50-624(c), which defines a consumer transaction subject to the requirements of the Kansas Consumer Protection Act, a solicitation by a supplier may be sufficient to subject a supplier to the requirements and penalties of the Act *regardless of whether the solicitation results in a sale, lease or other disposition of property within the State of Kansas.*" (Emphasis added.) 7 Kan. App. 2d at 13.

Similarly, in this case, the initial solicitation occurred in Kansas but the contract was signed in Missouri. Berry argues that any misrepresentation concerning the ownership of the cattle occurred in Missouri. However, in *Watkins*, the alleged deceptive act also occurred in Missouri, but the court still concluded there was jurisdiction to bring the claim in Kansas based on the solicitation. Accordingly, we conclude Berry's solicitation in Kansas was sufficient to subject him to the requirements and penalties of the KCPA. The trial court had subject matter jurisdiction to enter a judgment against Berry regarding the Brandt transaction.

Turning to the merits of the Brandt transaction, the trial court concluded Berry engaged in a deceptive act of misrepresentation

during contract formation by willfully stating he owned cattle, which he did not own. Therefore, the trial court found that Berry "willfully misrepresented a material fact" in violation of K.S.A. 50-626(b)(2), and granted a directed verdict in favor of the State. Whether Berry engaged in a deceptive act in violation of the KCPA typically is a jury question. See *Queen v. Lynch Jewelers, LLC.*, 30 Kan. App. 2d 1026, 1038, 55 P.3d 914, *rev. denied* 275 Kan. 965 (2002). The question is whether reasonable minds could have reached different conclusions about whether Berry willfully misrepresented his ownership in the cattle.

Berry acknowledged he did not own the cattle when he showed them to Brandt; rather, Ackerman owned the cattle at the time. However, Berry testified he was already buying 250 head of cattle from Ackerman and, in fact, Berry wired Ackerman $70,000 of the $80,000 Brandt had paid. Berry contends even if he did not own the cattle at the time he sold them to Brandt, he did not intend to willfully misrepresent ownership of the cattle in an attempt to deceive Brandt.

There was evidence at trial, through Berry's own testimony, to support his assertion. Berry's testimony indicated he was a broker in the cattle business, and prospective buyers understand a broker may not own the cattle at the time of a sales contract. Instead, according to Berry, the broker often purchases the cattle after a sales transaction has taken place. Berry testified that it is common for brokers to run advertisements attempting to sell cattle that they do not yet own.

The issue for the factfinder was whether Berry "willfully misrepresented" ownership of the cattle. Berry's state of mind was at issue and his credibility was a question for the jury. As a result of Berry's testimony, the jury may have concluded the State failed to prove that Berry willfully misrepresented his ownership of the cattle. When reviewing the evidence in Berry's favor, reasonable minds could have reached a different conclusion than the trial court concerning the alleged deceptive act. Accordingly, the trial court erred in granting the State's motion for a directed verdict concerning the Brandt transaction.

*Gannaway transaction*

Regarding the Gannaway transaction, the trial court concluded Berry engaged in a deceptive act of misrepresentation during contract formation by concealing facts from Gannaway. Specifically, the trial court found Berry had no intention of honoring the veterinary inspection provision of the contract, which allowed Gannaway to cancel the sale if the horse did not "vet check" to her satisfaction. The trial court found Berry "willfully concealed a material fact," in violation of K.S.A. 50-626(b)(3), and granted a directed verdict in favor of the State.

Again, whether Berry engaged in a deceptive act in violation of the KCPA typically is a jury question. See *Queen*, 30 Kan. App. 2d at 1038. The question here is whether reasonable minds could have reached different conclusions about whether Berry willfully concealed a material fact.

The veterinary inspection provision of the contract provided:

"A) The purchase of this horse by Buyers is contingent upon the horse passing a veterinary inspection to the sole satisfaction of Buyers. . . .

"B) Seller agrees that if the veterinary inspection reveals any defects, imperfections, abnormalities, deformities, irregularities, illnesses, or diseases that may inhibit or affect the health, soundness, performance ability, or resale ability of the horse, Buyers may return the horse to Seller for a full refund of all moneys paid to Seller by Buyers. Buyers agree that if they decide to return the horse, they will return him no later than 30 days after taking possession of the horse, unless otherwise agreed by the parties."

Berry testified he believed the veterinary inspection provision provided for a full refund only if the horse had any life-threatening diseases or illnesses, but not for known prior existing conditions. Berry contends even if his interpretation of the veterinary inspection provision was incorrect, his subsequent refusal to refund Gannaway's money did not establish that he willfully concealed a material fact during contract formation.

There was evidence at trial, through Berry's own testimony, to support his assertions about the Gannaway transaction. According to Berry, he intended to honor the veterinary inspection provision if the horse had any life-threatening diseases or illnesses. However, Berry testified Gannaway knew of the horse's arthritis and knee

condition. According to Berry, he and Gannaway's husband discussed the clicking sound coming from the horse's knees, which Berry attributed to arthritis. Berry also informed Gannaway of Welsh's veterinary examination findings, which included arthritis in both front legs and a right front low heel. Berry testified he believed the contract's veterinary inspection provision did not apply to preexisting conditions which had been disclosed to Gannaway.

Gannaway drafted the contract. Therefore, even though the veterinary inspection provision seems unambiguous, there was a possibility that Berry had a different interpretation of the provision. Admittedly, the contract specifically provided that the "agreement shall constitute the entire agreement between the parties and any prior understanding or representation of any kind preceding the date of this agreement, shall not be binding upon either party except to the extent incorporated in this agreement." Had this been a breach of contract action brought by Gannaway against Berry, Gannaway would have been entitled to a directed verdict on whether the contract had been breached. However, the issue in the KCPA claim was whether Berry "willfully concealed a material fact" concerning the contract. Berry's state of mind and his interpretation of the contract were relevant to whether Berry willfully concealed an intention not to honor the contract.

The jury should have been allowed to review the conflicting evidence and determine whether Berry's actions involved willful concealment. When reviewing the evidence in Berry's favor, reasonable minds could have reached a different conclusion than the trial court. Accordingly, the trial court erred in granting the State's motion for a directed verdict on the Gannaway transaction.

### Sawyer transaction

The trial court concluded Berry engaged in an unconscionable act during contract formation by expressing a misleading statement of opinion regarding the training and abilities of the roping horse purchased by Sawyer. The trial court determined "Berry's credibility and manner of presentation in court granted no foundation upon which a reasonable person could conclude that [the horse]

was a trained roping horse." The trial court also found that Sawyer relied upon Berry's statement to his detriment. Thus, the trial court determined Berry violated K.S.A. 50-627(b)(6), and the court granted the State's motion for a directed verdict.

As with the Brandt and Gannaway transactions, Berry's testimony regarding the Sawyer transaction conflicted with the State's evidence, and questions of fact were presented to the trial court. Although we have determined this precluded a directed verdict in the Brandt and Gannaway transactions, there is one important distinction concerning the Sawyer transaction. After hearing the evidence concerning the Sawyer transaction, the trial court determined Berry had committed an *unconscionable act* in violation of K.S.A. 50-627(b)(6), as opposed to the deceptive acts the trial court found Berry committed in the other two transactions. While the determination of whether a party has engaged in a deceptive act in violation of the KCPA typically is a jury question, the unconscionability of an act or practice is a question for the court. K.S.A. 50-627(b). This affects our standard of review on whether the trial court erred in granting a directed verdict on this claim.

Berry disagrees and argues it should have been up to the jury to resolve the disputed fact of whether Berry made a misleading statement about the training and abilities of the horse he sold to Sawyer. If the jury so found, it would have then been up to the court to determine whether this constituted an unconscionable act. We find no support for Berry's argument. To the contrary, in *Swanston v. McConnell Air Force Base Fed'l Cred. Union*, 8 Kan. App. 2d 538, 542, 661 P.2d 826 (1983), the plaintiff brought claims against the defendant under the KCPA alleging both deceptive acts and practices and unconscionable acts. After hearing the evidence, the trial court directed a verdict in favor of the defendant on all claims. On appeal, the court determined there was conflicting evidence, and the trial court erred in granting a directed verdict concerning the alleged deceptive acts and practices. However, the court noted the unconscionability of an act is a question of law for the court to determine. The court concluded the trial court's judgment as to the claim of unconscionability was not erroneous as a matter of law

and upheld the directed verdict on the unconscionability claim. 8 Kan. App. 2d at 542.

Thus, in judging a claim of unconscionability, the court determines both the facts and the ultimate legal conclusion. In making this determination, the court is permitted to weigh the credibility of the witnesses. Because the unconscionability of an act is a question for the court, the appellate court's review of such a determination is unlimited. *State ex rel. Stovall v. ConfiMed.com*, 272 Kan. 1313, 1317, 38 P.3d 707 (2002); *Farrell v. General Motors Corp.*, 249 Kan. 231, 238, 815 P.2d 538 (1991). Furthermore, the credibility of a witness will not be reweighed on appeal. *ConfiMed.com*, 272 Kan. at 1322.

Here, the trial court believed Sawyer's testimony over Berry's. Sawyer testified he contacted Berry about purchasing a trained roping horse. Berry showed Sawyer the horse and assured him it was a "finish roping horse." Sawyer was unable to rope with the horse prior to the sale, so he purchased the horse based on Berry's word that it was roping horse. After the sale, Sawyer took the horse to an arena and attempted to rope steers; however, the horse was unable to track the steers out of the gate. A couple of Sawyer's friends, who were more experienced ropers, also attempted to rope steers with the horse but had the same results as Sawyer.

Under these facts, the trial court did not err in determining Berry engaged in an unconscionable act during contract formation by expressing a misleading statement of opinion regarding the training and abilities of the horse purchased by Sawyer. Accordingly, the trial court did not err in granting the State's motion for a directed verdict regarding this violation of the KCPA.

In summary, we conclude the trial court erred in granting a directed verdict in favor of the State in the Brandt and Gannaway transactions. The case is remanded for further proceedings concerning those claims. The trial court's judgment against Berry concerning the Sawyer transaction is affirmed.

Affirmed in part, reversed in part, and remanded.