(301 P.3d 772)
No. 108,052

EDWIN S. DANA, SR., and DOUGLAS E. DANA, *Appellants*, v. HEARTLAND MANAGEMENT COMPANY, INC., d/b/a SHAWNEE COUNTY CREMATORY, d/b/a DOVE CREMATION AND FUNERAL SERVICES, RICHARD L. RAUSCH, JAY W. LUEHRING, LARY K. DODGE, DANIEL J. WERNER, and WARREN J. NEWCOMER, *Appellees*.

Opinion filed May 24, 2013.

*Karen S. Rosenberg* and *Paul K. Hentzen*, of Krigel & Krigel, P.C., of Kansas City, Missouri, for appellants.

*David R. Cooper* and *Teresa L. Watson*, of Fisher, Patterson, Sayler & Smith, LLP, of Topeka, for appellees.

Before McANANY, P.J., BUSER and STANDRIDGE, JJ.

STANDRIDGE, J.: Edwin S. Dana, Sr., and Douglas E. Dana (plaintiffs) appeal from the decision of the district court to grant summary judgment in favor of the defendants—a funeral and cremation company and staff—on plaintiffs' claims related to the temporary loss of the cremated remains of plaintiffs' son and twin brother, respectively, Edwin Dana, Jr. Plaintiffs contend the district court erred in granting summary judgment in favor of the defendants on their claims of outrage, willful interference with Edwin Jr.'s cremated remains, violations of the Kansas Consumer Protection Act (KCPA), and breach of fiduciary duty. Plaintiffs also claim the district court erred in dismissing as moot their motion to amend petition to add a claim of punitive damages.

## FACTS

On August 12, 2010, the deceased body of Edwin Jr. was discovered in his Topeka home. Edwin Jr. was a Native American member of the Passamaquoddy Indian Tribe and a military veteran. On August 13, 2010, Douglas went to Dove Cremation and Funeral Service and met with Richard Rausch, a funeral director and manager, to make arrangements for Edwin Jr.'s cremation. Rausch also spoke to Edwin Sr. by phone and informed him that as the next of kin he was required to sign an authorization for cremation. Rausch prepared a document titled "Authority to Cremate and Order for Disposition" and faxed it to Edwin Sr., who signed the document and sent it back to Dove. The document included directions that Edwin Jr.'s cremated remains should be shipped via registered mail to Edwin Sr. at his home address in Maine. There was no shipment date indicated on the authorization form, but according to Edwin Sr.'s testimony, Rausch told him that the ashes would be shipped "as soon as possible; more than likely [August] 17th." Conversely, Rausch claimed that he made no promises to Edwin Sr. or Douglas about when the remains would be sent. In alleged reliance on Rausch's promise to send Edwin Jr.'s remains by August 17, Edwin Sr. planned to have a wake,

funeral, and burial on the Passamaquoddy Reservation in Maine on August 24-26, 2010.

On August 14, 2010, Douglas viewed Edwin Jr.'s body in the garage of the Penwell-Gabel Mid-Town Chapel. When a body is decomposed, as Edwin Jr.'s was, viewings generally occur in the chapel garage. Before viewing the body, Rausch had Douglas sign a waiver of liability acknowledging that the body was in an advanced state of decomposition. Upon viewing the body, Douglas performed a smudge, a ceremonial release of the spirit which involved putting a substance on Edwin Jr.'s body and waving an eagle's wing. Douglas placed some items, including a fan, beads, and an eagle's wing in the body bag with Edwin Jr. Douglas returned to the funeral home on August 15, 2010, and observed Edwin Jr.'s body as it was placed into the crematory retort.

*The cremation process*

Newcomer Funeral Service Group owns the stock of Heartland Management Company, Inc., which does business as Dove Cremation and Funeral Services and Penwell-Gabel Funeral Homes. Shared Mortuary Services (SMS) is part of the Penwell-Gabel Funeral Homes and is an in-house centralized preparation center that performs cremation services at the Shawnee County Crematory. When a body is cremated there, the body is placed in a cooler until the time the cremation is to take place. Each body is accompanied throughout the process by a metal disk with a cremation ID number and a case record. The ID number is recorded on the case record, along with the following information: the date, the primary authorizing agent, the coroner's permit, the county, the container in which the body was brought to the crematory, and a description of the urn in which the cremated remains are to be placed. SMS also has a daily cremation log where the ID number is recorded along with the date and time the remains are placed inside and removed from the crematory retort.

At the time of Edwin Jr.'s cremation, when the body was placed into the retort, the metal ID disk was attached to a magnetic clip that hung on the outside. After processing, the remains were placed in a plastic bag and, along with the metal ID disk and case record,

were taken to the SMS office where the ID number, name, location of death, date of cremation, and the responsible funeral home were entered in a log. The remains were placed in an urn and then put into a locked storage locker. When the remains were placed into an urn, the person who removed the remains from the crematory created three identical labels containing the deceased's name, the cremation ID number, the date of cremation, place of death, and the responsible funeral home. One label was affixed on the outside of the urn; one label was placed on a note card and placed outside of the locker; and one label was laminated, affixed to the metal ID disk, and placed inside the urn.

*Edwin Jr.'s cremation and the search for his remains*

At 9:46 a.m. on August 15, 2010, Jay Luehring, an embalmer and funeral director at Shawnee County Crematory, placed Edwin Jr.'s body into the retort to be cremated. At 6:30 p.m., Luehring removed Edwin Jr.'s ashes, placed them in a temporary urn, and created three labels for the remains. In creating the labels, Luehring did not look at or read the labels before affixing them to the urn, the note card, and the ID disk and did not compare the ID number on the metal disk to the number on the label.

Late in the afternoon of August 18, Lary Dodge, the manager of SMS, received Edwin Jr.'s death certificate via fax. Dodge unsuccessfully attempted to locate a locker or urn labeled with Edwin Jr.'s name in order to place the death certificate in the file. Dodge also checked the completed case records and the filing cabinet where permanent files were kept but could not locate Edwin Jr.'s case file. Dodge then told Luehring that he was unable to locate the locker with Edwin Jr.'s remains; Luehring accompanied Dodge as he looked at the labels on the outside of each locker and checked inside each labeled locker to see if the label on the urn matched the label on the outside of the locker. Dodge did not look at the case file inside each locker to compare it to the labels. Dodge notified Rausch of his inability to located Edwin Jr.'s urn or case file. Rausch went to SMS and met with Dodge, where Rausch opened each locker, looked at the label on the urn in each locker, and compared the urn label to the label on the outside of the

locker. Rausch also searched a filing cabinet at SMS. Rausch did not look at the case files in any of the lockers.

On August 19, Dodge, Rausch, Luehring, and Jed Dunnichay, the senior vice-president of Heartland Management Company, went to Dove, the Parker-Price Funeral Home, and other funeral homes in Topeka to see if Edwin Jr.'s remains had been mistakenly taken to another funeral home. In the course of searching, they looked in other rooms in the basements of the Dove and Parker-Price funeral homes, emptied the shelving at SMS, went through the storeroom in the back of the building, and looked through a trash dumpster. Dodge also told Melissa Schroeder, an embalmer at SMS, that Edwin Jr.'s remains and case file were missing. Schroeder searched the file cabinet that held the closed files and made phone calls to other funeral homes.

On August 20, Dunnichay interviewed Rausch, Dodge, Luehring, and other individuals to discuss the chain of custody that had occurred with Edwin Jr.'s remains. Dunnichay also examined the inside and outside of each locker but did not look at the case files or the ID disks in any of the lockers. In addition, Dunnichay spoke with funeral directors at other Penwell-Gabel funeral homes about the search for Edwin Jr.'s remains.

That same day, Warren Newcomer, president of Newcomer Funeral Service Group, was notified of the situation. Newcomer met with Dodge, Luehring, Dunnichay, and Ed Tuggle, the chief operating officer of Newcomer Funeral Service Group, and reviewed their procedures and discussed the steps that had been taken to locate Edwin Jr.'s remains. Newcomer was convinced at that time that a thorough search had been conducted.

On August 21, Dunnichay met with Daniel Werner, the managing funeral director at Dove, and explained the loss of Edwin Jr.'s remains and told him that all avenues to locate the remains had been exhausted. Dunnichay and Werner called Edwin Sr. to notify him of the loss. Dunnichay informed Edwin Sr. that Edwin Jr.'s remains had either been misplaced or stolen, and he described the procedures that were taken to safeguard the remains and the steps that had been taken to search for them. Edwin Sr. called Douglas and informed him what had happened.

That same day, Werner filed a police report with the Topeka Police Department, and Werner and Dunnichay met with the police. On August 23, Newcomer wrote a letter to Edwin Sr. apologizing for the loss of Edwin Jr.'s remains and informing him that a theft must have occurred and that the police were investigating the matter.

On August 24-26, Edwin Jr.'s wake and funeral service were held. Edwin Sr. had sought advice as to whether to tell the tribal members and his other children what had happened; he ultimately decided to go ahead with the planned wake and funeral, and he and Douglas did not tell anyone other than the priest that Edwin Jr.'s ashes were not present.

*Discovery of Edwin Jr.'s remains*

On August 31, Becca Duncan, a funeral director at Penwell-Gabel, noticed the name Swenson on the outside of a storage locker. Duncan had previously made funeral arrangements with the Swenson family, so she called them to verify that the burial had already occurred. Duncan opened the locker and saw that the urn in the locker had a label with Swenson's name, but the ID disk and the case file in the locker belonged to Edwin Jr.

As it turned out, Edwin Jr.'s remains were never missing but were instead mislabeled by Luehring when he created the labels for Edwin Jr. and Swenson. Labels are not kept in the printer but are instead fed one sheet at a time as they are needed. Luehring believed that instead of single clicking on the print command when making Swenson's labels, he double-clicked it, which sent two sets of Swenson labels to the printer queue. Then, when Luehring entered the information for Edwin Jr. and attempted to print it, the second set of Swenson labels printed, and he mistakenly placed those on Edwin Jr.'s urn. Luehring was later disciplined for this error.

After the discovery of Edwin Jr.'s remains on August 31, Dunnichay called Edwin Sr. to advise him that the remains had been located and explained how they had been verified as belonging to Edwin Jr. Rausch personally took Edwin Jr.'s remains to the post

office and mailed them to Edwin Sr., who signed for them on September 8, 2010.

*Plaintiffs file suit*

On November 15, 2010, plaintiffs filed a petition against the defendants alleging claims of negligence, willful interference with plaintiffs' right to Edwin Jr.'s cremated remains, violations of the KCPA, breach of fiduciary duty, and outrage. Plaintiffs subsequently moved to amend their petition to include a claim for punitive damages.

The defendants answered, opposed plaintiffs' motion to amend, and moved for summary judgment after discovery, including depositions regarding the circumstances involved. The district court ultimately granted the defendants' motion for summary judgment on all claims and dismissed as moot plaintiffs' motion for punitive damages.

## ANALYSIS

On appeal, plaintiffs contend the district court erred in granting summary judgment in favor of the defendants on their claims of outrage, willful interference with Edwin Jr.'s cremated remains, violations of the KCPA, and breach of fiduciary duty. Plaintiffs also argue that their motion to amend petition to include a claim for punitive damages was not moot. Plaintiffs do not challenge the district court's decision to grant summary judgment on their negligence claim or the district court's ruling that Douglas lacked standing with respect to certain claims.

When the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact, the moving party is entitled to judgment as a matter of law and summary judgment is appropriate. The district court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, the adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dis-

pute must be material to the conclusive issues in the case. On appeal, the same rules apply; summary judgment must be denied if reasonable minds could differ as to the conclusions drawn from the evidence. *Osterhaus v. Toth*, 291 Kan. 759, 768, 249 P.3d 888 (2011).

" ' "An issue of fact is not genuine unless it has legal controlling force as to the controlling issue. The disputed question of fact which is immaterial to the issue does not preclude summary judgment. If the disputed fact, however resolved, could not affect the judgment, it does not present a genuine issue of material fact. [Citation omitted.]" ' *Mitchell v. City of Wichita*, 270 Kan. 56, 59, 12 P.3d 402 (2000) [citation omitted]." *Hall v. Shelter Mutual Ins. Co.*, 45 Kan. App. 2d 797, 800, 253 P.3d 377 (2011), *rev. denied* 293 Kan. 1106 (2012).

### 1. *Outrage*

In order to establish a claim of outrage, a plaintiff must prove: (1) the defendant engaged in intentional or reckless conduct; (2) such conduct was extreme and outrageous; (3) such conduct was causally connected to plaintiff's mental distress; and (4) the plaintiff's mental distress was extreme and severe. *Valadez v. Emmis Communications*, 290 Kan. 472, 476, 229 P.3d 389 (2010); PIK Civ. 4th 127.70.

In response to the defendants' summary judgment motion, plaintiffs offered an affidavit from a licensed family therapist, Dr. Pauline Boss. Dr. Boss did not examine Edwin Sr. or Douglas but reviewed plaintiffs' petition, deposition testimony, affidavits, and medical records. Dr. Boss opined that the normal grief and distress felt by plaintiffs resulting from Edwin Jr.'s death could not be separated from the emotional distress caused by the defendants' conduct of losing the ashes and lying about them being stolen, which caused "unnecessary pain and suffering piled on top of a family's normal grieving." Dr. Boss claimed that plaintiffs' emotional distress was compounded by going through with the wake and funeral service with an empty urn and that plaintiffs suffered shame and embarrassment by having to endure the Passamaquoddy rituals and military honors being performed over the urn that only they knew was empty. Dr. Boss stated that plaintiffs' emotional distress was not cured upon receipt of the ashes, as the inconsistency of being told the ashes were stolen and then being told they were found at

the funeral home was "an unusually painful and traumatic situation" that ruined plaintiffs' trust and left them with no closure.

The district court granted summary judgment in favor of the defendants on the outrage claim, finding there was no evidence that the defendants acted willfully, intentionally, wantonly, or recklessly with regard to the misplacement of Edwin Jr.'s remains.

Plaintiffs allege that the district court erroneously granted summary judgment on this claim by focusing solely on the defendants' conduct in losing Edwin Jr.'s remains. Instead, plaintiffs contend genuine issues of material fact exist with respect to the following series of transactions which must be resolved before it can be determined whether the defendants acted intentionally or recklessly, including defendants' "conducting a wholly inadequate search for the ashes, recklessly concealing the loss of the ashes from plaintiffs and lying to plaintiffs by telling them the ashes were stolen." Specifically, plaintiffs claim that the following factual disputes in the record preclude summary judgment because they could show that the defendants acted intentionally and with reckless disregard: (1) whether Rausch told plaintiffs that Edwin Jr.'s remains would be shipped by August 17; (2) when the defendants became aware of the date of Edwin Jr.'s wake and funeral; (3) whether the search for the remains was reasonable; (4) why plaintiffs were not told right away that the remains were missing; (5) whether there was a reasonable basis to believe the remains were stolen; and (6) Newcomer's intent in sending the apology letter to Edwin Sr.

A claim of outrage has two threshold requirements: (1) The defendant's conduct must be regarded as "so extreme and outrageous as to permit recovery" and (2) plaintiff's emotional distress must be "so severe that no reasonable person should be expected to endure it." *Valadez*, 290 Kan. at 477. Plaintiffs contend that the defendants' conduct was outrageous in the context of the vulnerable, emotional, and confusing time that typically follows the death of a loved one. Plaintiffs further claim that the district court ignored Dr. Boss' affidavit and did not point to any evidence in the record that contradicted her opinion regarding the severity of their emotional distress.

### a. *Extreme and outrageous conduct*

Extreme and outrageous conduct goes "beyond the bounds of decency and [is] to be regarded as atrocious and utterly intolerable in a civilized society." *Miller v. Sloan, Listrom, Eisenbarth, Sloan & Glassman,* 267 Kan. 245, 257, 978 P.2d 922 (1999).

Kansas cases have generally held in favor of defendants in outrage cases, finding that the alleged conduct was insufficiently outrageous to support the claim. *Lindemuth v. Goodyear Tire & Rubber Co.,* 19 Kan. App. 2d 95, 100-01, 864 P.2d 744 (1993); see, *e.g., Moore v. State Bank of Burden,* 240 Kan. 382, 388, 729 P.2d 1205 (1986), *cert. denied* 482 U.S. 906 (1987) (no outrage claim where bank erroneously set off funds against a legitimate indebtedness owed to bank); *Burgess v. Perdue,* 239 Kan. 473, 475-77, 721 P.2d 239 (1986) (mother who was told that her son's brain was in a jar could not maintain an action for outrage); *Neufeldt v. L. R. Foy Constr. Co.,* 236 Kan. 664, 665, 668-69, 693 P.2d 1194 (1985) (no outrage claim allowed by a wife recovering from a miscarriage who was falsely told that an arrest warrant had been issued for her husband); *Roberts v. Saylor,* 230 Kan. 289, 295, 637 P.2d 1175 (1981) (no outrage claim where doctor expressed dislike of patient prior to patient undergoing surgery); *Ely v. Hitchcock,* 30 Kan. App. 2d 1276, 1289, 58 P.3d 116 (2002) (funeral director allowing plaintiff to view his mother's body with a cut to her forehead and blood on her face and hair not sufficient to support claim of outrage).

In *Burgess,* the plaintiff's son was a resident of the Kansas Neurological Institute (KNI) at the time of his death. The plaintiff refused to grant permission for a full autopsy, but the paperwork mistakenly did not limit the autopsy as the plaintiff had requested. After a full autopsy was performed, the coroner removed the brain of the plaintiff's son and sent it to KNI. After her son's funeral, a doctor from KNI called the plaintiff, informed her they had her son's brain, and asked what they should do with it. The plaintiff brought a claim of outrage against the State based on its employee informing her they had her son's brain. Our Supreme Court rejected this argument, holding that while the wording used by the

doctor was not the most tactful, the doctor's conduct was not outrageous:

"While the statements made to the mother were probably shocking, they were not outrageous—'so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' The doctor called the mother because she knew the mother had not wanted the brain autopsied. The doctor was concerned that any impropriety be resolved. She did not intend to harass or intimidate or otherwise abuse the mother. No malice was involved." 239 Kan. at 477.

In the present case, there is no suggestion that the defendants' actions here—temporarily misplacing Edwin Jr.'s cremated remains, delaying shipment to Edwin Sr., and claiming that the remains may have been stolen—were so outrageous in character or so extreme in degree as to go beyond the bounds of decency. Nor were they so atrocious as to be regarded as utterly intolerable in a civilized society. See *Miller*, 267 Kan. at 257. At most, plaintiffs have alleged facts showing that the defendants' actions were irresponsible and/or negligent. Under Kansas law, this is not enough to recover for a claim of outrage.

### b. *Severe emotional distress*

Additionally, liability for a claim of outrage only arises when the plaintiff's distress is "extreme" or "severe." See *Taiwo v. Vu*, 249 Kan. 585, 593-94, 822 P.2d 1024 (1991); Restatement (Second) of Torts § 46, comment j, pp. 77-78 (1964). Fright, concern, embarrassment, worry, and nervousness do not constitute sufficient harm to warrant the award of damages. See *Roberts*, 230 Kan. at 293-94. " 'There is no laundry list of what qualifies as the requisite level of severity [of emotional distress] . . . . [I]t is fair to say that headaches, sleeplessness, irritability, anxiety, depression, listlessness, lethargy, intermittent nightmares, and the like would probably not suffice . . . .' " *Valadez*, 290 Kan. at 479 (quoting Boston, Kline & Brown, Emotional Injuries: Law and Practice § 22:7 [1998]); see *Ely*, 30 Kan. App. 2d at 1289-90.

In response to interrogatories served upon them, plaintiffs described the injuries they sustained as " 'extreme and severe emotional distress.' " Plaintiffs also alleged that the mental anguish re-

sulting from the cover-up and events surrounding Edwin Jr.'s cremation aggravated their existing health conditions. Specifically, Douglas testified that prior to Edwin Jr.'s death, he suffered from posttraumatic stress and depressive disorders and he had a pacemaker and a defibrillator. After the events occurred with Edwin Jr.'s remains, Douglas claimed that he suffered from chest pain, discomfort, and crying and that he had to increase his heart and sleep medications. Douglas stated that he did not really believe the ashes sent to Edwin Sr. really belonged to Edwin Jr. Edwin Sr. testified that prior to Edwin Jr.'s death, he had a brainstem hemangioma and suffered from posttraumatic stress disorder. He testified that he had seen a psychologist at the veteran's hospital twice following Edwin Jr.'s death.

But plaintiffs' claimed injuries do not rise to the level of extreme or severe distress. Even if we consider Dr. Boss' affidavit, we must do so in conjunction with the fact that Dr. Boss did not examine plaintiffs and her affidavit is conclusory in nature and not based on any specific facts demonstrating plaintiffs' level of distress. Moreover, the record does not explicitly show that plaintiffs sought medical treatment or psychological counseling specifically related to the defendants' loss of Edwin Jr.'s remains.

None of the disputed facts alleged by plaintiffs are material to whether the defendants' conduct was extreme and outrageous or to whether plaintiffs suffered extreme and severe emotional distress. Accordingly, the district court properly granted summary judgment on plaintiffs' claim of outrage.

### 2. *Willful interference with cremated remains*

Kansas recognizes the tort of interference with a dead body. Recovery on a claim of intentional interference with a dead body requires proof of intentional or malicious conduct. See *Burgess*, 239 Kan. at 479-80; *Ely*, 30 Kan. App. 2d at 1283-85.

In granting summary judgment on plaintiffs' claim of intentional interference with Edwin Jr.'s remains, the district court found that the tort of intentional interference with a dead body should be extended to include cremated remains. However, the court held that the claim failed because there was no evidence that the de-

fendants' conduct as it related to misplacing Edwin Jr.'s remains was intentional.

Plaintiffs urge this court to affirm the district court's ruling extending the tort of intentional interference with a dead body to include cremated remains but claim the court erred in granting summary judgment on this issue because there are genuine issues of material fact that exist as to whether the defendants' conduct was intentional or reckless, including: (1) when the defendants knew of the wake and funeral plans, (2) whether the defendants' search for Edwin Jr.'s remains was reasonable, (3) whether the defendants had a reasonable basis to claim that a theft had occurred, (4) what Newcomer's intent was in sending the apology letter to Edwin Sr., and (5) whether Newcomer genuinely believed a theft had occurred.

It does not appear that the question of whether the tort of intentional interference with a dead body should include cremated remains has been decided in Kansas or in other jurisdictions. Given that cremation is a common alternative to burial in this country, it makes sense that the tort should be extended to include cremated remains. However, it is not necessary for this court to decide the issue in this case because plaintiffs cannot show that the defendants' conduct was intentional or malicious.

In *Burgess*, our Supreme Court held that a physician was negligent in failing to inform the coroner that the decedent's mother did not want an autopsy to include her son's brain but was not liable to the mother for emotional distress damages for interfering with her son's dead body because recovery of such damages requires proof of intentional or malicious conduct. 239 Kan. at 479-80. In *Ely*, the plaintiff claimed that a mortuary worker intentionally interfered with his mother's body when the transportation cot carrying her body fell over, resulting in a laceration and blood on his mother's face, head, and hair. On appeal, this court held that summary judgment was appropriate because the evidence indicated that the cot fell accidentally and there was no evidence that the worker intentionally battered the woman's body. 30 Kan. App. 2d at 1284-85.

Here, none of the disputed facts alleged by Edwin Sr. are material to the defendants' handling of Edwin Jr.'s remains. There is no evidence or allegation that the defendants mishandled Edwin Jr.'s corpse or cremated remains or that the defendants intentionally or maliciously kept the remains from Edwin Sr. Rather, it appears that the remains were accidentally mislabeled, and when the labeling error was discovered and the remains located, they were mailed to Edwin Sr. Because there is no evidence that the defendants committed an intentional or malicious act with regard to Edwin Jr.'s remains, the district court properly granted summary judgment on plaintiffs' claim of intentional interference with the remains.

### 3. *The Kansas Consumer Protection Act*

Plaintiffs argue that the district court erred in granting summary judgment on their claims that the defendants violated the KCPA by engaging in deceptive and unconscionable acts in connection with a consumer transaction. Specifically, plaintiffs contend that the defendants violated K.S.A. 2012 Supp. 50-626(b)(2) and (b)(3) and K.S.A. 50-627(b)(6) when they told plaintiffs that Edwin Jr.'s remains had been stolen.

The KCPA was enacted "to protect consumers from suppliers who commit deceptive and unconscionable practices." K.S.A. 50-623(b). In granting summary judgment on this claim, the district court found there was no evidence of deceptive or unconscionable conduct because the defendants' actions in misplacing Edwin Jr.'s remains and telling plaintiffs the remains may have been stolen was not willful or done with an intent to injure or harm plaintiffs. The court further held that whether the defendants believed the ashes had been stolen was not material to any delay in advising plaintiffs of the situation.

### a. *Deceptive acts under K.S.A. 2012 Supp. 50-626*

K.S.A. 2012 Supp. 50-626 provides, in relevant part:

"(a) No supplier shall engage in any deceptive act or practice in connection with a consumer transaction.

"(b) Deceptive acts and practices include, but are not limited to, the following, each of which is hereby declared to be a violation of this act, whether or not any consumer has in fact been misled:

. . . .

(2) the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact;

(3) the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact."

Whether a person has engaged in deceptive acts or practices under K.S.A. 2012 Supp. 50-626 is ordinarily a question of fact. However, summary judgment is appropriate on claims where there is no evidence of deceptive conduct. *Crandall v. Grbic*, 36 Kan. App. 2d 179, 196, 138 P.3d 365 (2006); accord *Bomhoff v. Nelnet Loan Services, Inc.*, 279 Kan. 415, Syl. ¶ 4, 109 P.3d 1241 (2005). Intent is an element of a deceptive practices claim under K.S.A. 2012 Supp. 50-626(b)(2) and (b)(3). *Crandall*, 36 Kan. App. 2d at 196. A willful act under the KCPA is one performed with a designed purpose or intent on the part of a person to do wrong or to cause injury to another. *Tufts v. Newmar Corp.*, 53 F. Supp. 2d 1171, 1178 (D. Kan. 1999); see PIK Civ. 4th 103.04.

Plaintiffs argue that the defendants committed deceptive acts by purposefully lying to them about Edwin Jr.'s remains being stolen and in purposefully and intentionally concealing the loss from them. For support, plaintiffs rely on the fact that there was no evidence of a break-in, none of the employees or senior management believed there was a break-in, police were not contacted until Edwin Sr. demanded it, the search for Edwin Jr.'s remains was not reasonable, a theft had never occurred there before, and there is a dispute as to whether Newcomer had a reasonable basis to conclude that there was a theft. Plaintiffs also allege that the defendants' conduct was material to their claims of emotional distress as set forth in Dr. Boss' affidavit and that the defendants' failure to earlier disclose the loss of Edwin Jr.'s remains prevented the postponement of the wake and funeral, which further contributed to their emotional distress.

Plaintiffs' argument is without merit for three reasons. First, there is no evidence in the record to show that the defendants

purposefully lied to plaintiffs about Edwin Jr.'s remains being stolen. While several of the defendants and other employees testified in depositions that there had been no evidence of a break-in and that they thought a theft was unlikely, they could not come up with any other explanation at that time for the loss of Edwin Jr.'s remains and wanted to explore all avenues while they continued to investigate the circumstances.

Second, even if it is true that the defendants did not believe that Edwin Jr.'s remains had been stolen, there is no evidence in the record to establish that the defendants' act of telling plaintiffs that Edwin Jr.'s remains must have been stolen was made with the purpose or intent to do wrong or cause injury to plaintiffs. See *Tufts*, 53 F. Supp. 2d at 1178. Although the remains were later found and turned out not to have been stolen, it does not make the defendants' mistaken belief at the time they spoke to plaintiffs about the possible theft willful. After the defendants discovered Edwin Jr.'s remains were missing, they spent 2 days searching for them before they called plaintiffs. The fact that the defendants did not call plaintiffs immediately does not suggest malicious behavior.

Third and finally, the defendants' actions of telling plaintiffs that the ashes must have been stolen arguably did not involve a material fact. K.S.A. 2012 Supp. 50-626 does not define the term "material fact," but it has been defined as " 'one to which a reasonable person would attach importance in determining his [or her] choice of action in the transaction involved.' " *Farrell v. General Motors Corp.*, 249 Kan. 231, 244, 815 P.2d 538 (1991).

The defendants learned the ashes were missing on the afternoon of August 18, and the plaintiffs received notice of the loss on the morning of August 21. The wake and funeral were scheduled for August 24-26. Edwin Sr. testified that he spoke to a church official, Sister Janice, about the missing ashes on August 21 or 22 and sought advice about whether to go ahead with the services or to postpone them. Sister Janice recommended that he go ahead with the wake and funeral without the ashes and do another service later when the ashes were found. Thus, as late as August 21, Edwin Sr. had the option to postpone the wake and funeral but chose not to. Plaintiffs do not claim, and there is no indication in the record,

that Edwin Sr. would have chosen a different option if he had been told the remains were simply lost or misplaced rather than stolen.

### b. *K.S.A. 50-627*

K.S.A. 50-627 provides, in relevant part:

"(a) No supplier shall engage in any unconscionable act or practice in connection with a consumer transaction. An unconscionable act or practice violates this act whether it occurs before, during or after the transaction.

"(b) The unconscionability of an act or practice is a question for the court. In determining whether an act or practice is unconscionable, the court shall consider the circumstances of which the supplier knew or had reason to know, such as, but not limited to the following that:

. . . .

(6) the supplier made a misleading statement of opinion on which the consumer was likely to rely to the customer's detriment."

Whether a defendant committed unconscionable acts is a question of law for the court. K.S.A. 50-627(b); *State ex rel. Stovall v. DVM Enterprises, Inc.*, 275 Kan. 243, 248, 62 P.3d 653 (2003). Summary judgment is appropriate if there is no evidence of unconscionable acts. *Bomhoff*, 279 Kan. 415, Syl. ¶ 4. An appellate court has unlimited review of the district court's unconscionability determination. *State ex rel. Kline v. Berry*, 35 Kan. App. 2d 896, 907, 137 P.3d 500 (2006).

Plaintiffs claim that genuine issues of material fact exist with respect to whether the defendants' loss of Edwin Jr.'s remains and unconfirmed statement to the family that the remains must have been stolen was unconscionable, including the adequacy of the search for Edwin Jr.'s remains, the date that the defendants learned of the wake and funeral plans, the reason for the defendants' concealment of the loss of the remains from the plaintiffs, whether the defendants had a reasonable basis for telling plaintiffs the remains must have been stolen, and the defendants' intent in telling plaintiffs the remains must have been stolen.

"Broadly viewed, unconscionability reflects a gross disparity in the value of a transaction favoring the supplier resulting, at least in part, from unequal bargaining power or knowledge, often tied to the buyer's physical or mental infirmity, illiteracy, or lack of fluency in the language used to make the sale. [Citation omitted.]"

*Golden v. Den-Mat Corporation*, 47 Kan. App. 2d 450, 491, 276 P.3d 773 (2012). In order to render the contract between the parties unconscionable, there must be "some element of deceptive bargaining conduct present as well as unequal bargaining power." *Willman v. Ewen*, 230 Kan. 262, 266, 634 P.2d 1061 (1981).

In this case, there is nothing in the record to indicate deceptive bargaining or unequal bargaining power in negotiating the contract at issue. Plaintiffs entered into a contract with Dove to perform cremation services, which were performed. Although the defendants were in a position of having greater knowledge of the circumstances involved and had, in fact, misplaced Edwin Jr.'s remains, the remains were later located and shipped to Edwin Sr. The defendants' conduct, while perhaps careless or negligent, does not rise to the level of unconscionable. Moreover, there is no showing that the defendants knowingly, or with reason to know, made a misleading statement of opinion or that plaintiffs relied on such a statement to their detriment. Rather, it appears that the defendants merely expressed their mistaken belief that Edwin Jr.'s remains must have been stolen, and plaintiffs do not suggest what they would have done differently if the defendants had stated that the remains were lost or misplaced rather than stolen.

Because there is no evidence showing that the defendants committed deceptive or unconscionable acts in connection with the temporary loss/misplacement of Edwin Jr.'s remains, the district court properly granted summary judgment on plaintiffs' claims of KCPA violations.

### 4. *Breach of fiduciary duty*

The district court granted summary judgment on plaintiffs' breach of fiduciary duty claim, finding, in part, that there was no evidence of a fiduciary relationship or any special trust that existed between plaintiffs and the defendants upon which plaintiffs relied. Plaintiffs allege the district court erred in granting summary judgment on this claim because a fiduciary relationship existed between the parties due to the trust and confidence they placed in the defendants to safeguard Edwin Jr.'s remains.

"A fiduciary relationship exists where there has been a special confidence reposed in one who, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one reposing the confidence. [Citation omitted.]" *Reebles, Inc. v. Bank of America, N.A.*, 29 Kan. App. 2d 205, 208, 25 P.3d 871, *rev. denied* 272 Kan. 1419 (2001). Whether a fiduciary relationship exists depends on the facts and circumstances of each case. *Denison State Bank v. Madeira*, 230 Kan. 684, 691, 640 P.2d 1235 (1982). In reviewing a district court's determination of the existence or nonexistence of a fiduciary relationship, an appellate court is required to consider the evidence in the light most favorable to the party who prevailed below. *Olson v. Harshman*, 233 Kan. 1055, 1057, 668 P.2d 147 (1983); *Wilson v. Wilson*, 37 Kan. App. 2d 564, 576, 154 P.3d 1136 (2007).

Two types of fiduciary relationships exist: (1) those specifically created by contract such as principal and agent and (2) those implied in law due to the factual situation surrounding the involved transactions and the relationship of the parties to each other and to the questioned transactions. *Wilson*, 37 Kan. App. 2d at 577. Examples of a fiduciary relationship include the acting of one party for another, the exercising of influence by one party over another, the reposing of confidence by one party in another, the inequality of the parties, and the dependence of one party on another. *Morrison v. Watkins*, 20 Kan. App. 2d 411, 422, 889 P.2d 140, *rev. denied* 257 Kan. 1092 (1995). "A confidential relationship is not presumed, and the burden of proving such a relationship existed rests upon the party asserting its existence. [Citation omitted.]" *Kampschroeder v. Kampschroeder*, 20 Kan. App. 2d 361, 365, 887 P.2d 1152, *rev. denied* 257 Kan. 1092 (1995). A party may not "unilaterally impose a fiduciary relationship on another without a conscious assumption of such duties by the one sought to be held liable as a fiduciary." *Linden Place v. Stanley Bank*, 38 Kan. App. 2d 504, Syl. ¶ 5, 167 P.3d 374 (2007).

Plaintiffs claim that funeral homes have a unique relationship with, and owe a special duty of care to, their customers. They contend that Edwin Sr.'s designation of the funeral home as his agent to ship Edwin Jr.'s remains could have created a fiduciary relation-

ship, and they suggest that the defendants' own policies and advertising—which note the professionalism and public trust they are charged with in providing the "vital service" of cremation—contributed to the establishment of a fiduciary relationship. To that end, plaintiffs allege that they placed their trust in the defendants to keep track of Edwin Jr.'s remains and ship them to Edwin Sr. in time for the wake and funeral, and that once they agreed to let the defendants cremate Edwin Jr., all information and control over the whereabouts of Edwin Jr.'s remains rested solely with the defendants.

No Kansas case has addressed the issue of whether a fiduciary duty arises between a funeral home and its customers, but other jurisdictions addressing the issue have held that such a relationship does not exist. See, e.g., *Jackson v. McKay-Davis Funeral Home, Inc.*, 830 F. Supp. 2d 635, 649-50 (E.D. Wis. 2011) (no fiduciary relationship formed when funeral home assumed control over decedent's remains and agreed to return remains to plaintiffs for burial); *Kennedy v. Carriage Cemetery Services, Inc.*, 727 F. Supp. 2d 925, 931 (D. Nev. 2010) (no fiduciary duty where decedent cremated without required authorization); *In re Tri-State Crematory Litigation*, 215 F.R.D. 660, 683 (N.D. Ga. 2003) ("'[t]he mere fact that one reposes great trust and confidence in another does not serve to create a confidential relationship'"); *Gakin v. City of Rapid City*, 698 N.W.2d 493, 500 (S.D. 2005) (no fiduciary relationship existed between plaintiff and cemetery because plaintiff "did not relinquish control over confidential decision making inherent in fiduciary relationships"); *Evans v. Chambers Funeral Homes*, No. 89,900, 2008 WL 2766173, at *3 (Ohio App. 2008) (unpublished opinion) (holding that there is no fiduciary duty between funeral homes and their customers in wrongful burial cases); but see *Pacheco v. Rogers & Breece, Inc.*, 157 N.C. App. 445, 452-53, 579 S.E.2d 505 (2003) (stating that "a personal service contract to provide funeral arrangements might, in appropriate circumstances, give rise to a fiduciary relationship," but declining to find such a relationship existed in that case).

Plaintiffs rely on California caselaw which recognizes mortuaries and crematories owe an independent tort duty arising from a spe-

cial relationship with their customers. However, this duty is specific to California common law and is a separate relationship from a fiduciary duty. See *Wilson v. Houston Funeral Home*, 42 Cal. App. 4th 1124, 1140, 50 Cal. Rptr. 2d 169 (1996) (funeral home's failure to provide family with appropriate and dignified burial service not a breach of fiduciary duty, but rather a breach of mortuary's special relationship with the family, a separate relationship recognized by California common law).

There is no question that plaintiffs placed trust and confidence in the defendants' ability to safeguard and ship Edwin Jr.'s remains in a timely manner. But

"[i]f a fiduciary duty were created in all instances where one party to a contract placed trust and confidence in the other party to complete such contract as agreed, every breach of contract claim could give rise to a counterpart breach of fiduciary duty claim, a result not supported by the law." *Jackson*, 830 F. Supp. 2d at 650.

Plaintiffs entered into a contract with Dove for cremation services. There is no evidence to suggest that the defendants were in a superior position to exercise influence over plaintiffs as a result of their contractual relationship. The contract itself does not give the funeral home an unfair advantage or relinquish Edwin Sr.'s control over decision making related to the shipment of Edwin Jr.'s remains, which are key characteristics of fiduciary relationships. Additionally, plaintiffs do not allege, and the record does not suggest, that the parties had unequal bargaining power based on unequal knowledge of the facts. In fact, plaintiffs' claims do not arise from any exercise of undue influence by the defendants, but instead from the defendants' actions of mislabeling Edwin Jr.'s remains, expressing a mistaken belief that the remains had been stolen, and failing to deliver the remains in time for the wake and funeral. Simply put, the facts here do not demonstrate anything beyond a normal relationship between a bereaved family and a funeral home. Thus, the district court properly held that no fiduciary relationship existed between the parties and granted summary judgment on this claim.

### 5. *Motion to amend petition to add claim for punitive damages*

On the same day that the defendants filed their summary judgment motion, plaintiffs moved to amend their petition to assert a claim for punitive damages against Newcomer and Newcomer Funeral Services Group, Inc. on their claims of willful interference with Edwin Jr.'s remains, violations of the KCPA, and breach of fiduciary duty. Following its decision to grant summary judgment in favor of the defendants, the district court dismissed the punitive damages motion as moot.

On appeal, plaintiffs contend the district court erred in ruling that the punitive damages motion was moot because there are genuine issues of material fact relating to whether the defendants' conduct in concealing the loss of Edwin Jr.'s remains and telling plaintiffs the remains must have been stolen was intentional, willful, and reckless. However, because the district court's grant of summary judgment was proper on all claims, this issue is moot. See *Bezona v. Tomson*, 25 Kan. App. 2d 210, 214, 960 P.2d 252 (1998).

Affirmed.