(58 P.3d 116)
No. 86,860

DAVID M. ELY, *Appellant,* v. CHARLES HITCHCOCK; SERVICES OF KANSAS, INC., d/b/a OLD MISSION MORTUARY; and WESLEY MEDICAL CENTER, L.L.C., *Appellees.*

Opinion filed November 27, 2002.

*Kevin V. Rider*, of Brown, Dengler, Good & Rider, L.C., of Wichita, for appellant.

*Michelle M. Watson* and *John H. Gibson*, of Gilliland & Hayes, P.A., of Wichita, for appellee Wesley Medical Center.

*Jay Fowler, Holly A. Dyer*, and *James D. Oliver*, of Foulston Siefkin LLP, of Wichita, for appellees Charles Hitchcock and Old Mission Mortuary.

Before GERNON, P.J., GREEN and JOHNSON, JJ.

GREEN, J.: David M. Ely appeals the district court's judgment granting summary judgment in favor of Charles Hitchcock; Services of Kansas, Inc., d/b/a Old Mission Mortuary (Old Mission); and Wesley Medical Center, L.L.C. (Wesley).

Ely contends that the trial court improperly dismissed his claim of interference with a dead body. In addition, he maintains that the trial court wrongly dismissed his claim of negligence per se. Finally, he contends that the trial court erred in dismissing his claims of outrage and negligent infliction of emotional distress. We disagree and affirm.

Ely sued Hitchcock, Hitchcock's employer, Old Mission, and Wesley. Ely's petition alleged that the defendants had intentionally, maliciously, or recklessly interfered with the body of his mother, Shirley Forassiepi. The petition further alleged that defendants' interference with Forassiepi's body caused Ely mental anguish and emotional distress when he viewed the body. Ely's legal claims

were for negligent infliction of emotional distress, negligence per se (for violation of administrative regulations), intentional mishandling of a dead body, and outrage.

Hitchcock, Old Mission, and Wesley moved for summary judgment. The parties agreed on the following uncontroverted facts through the course of the summary judgment proceedings.

Ely was the natural son of Forassiepi. Forassiepi had suffered from schizophrenia most of her life. Ely was separated from his mother when he was 7 years old. Over the next 32 years, Ely talked with his mother on the telephone once every year or two and saw her only once. After this long period of separation, Ely lived with Forassiepi in Little Rock, Arkansas, for several months. Later, he was in contact with his mother almost every day by telephone.

Forassiepi spent her last months in health care facilities and nursing homes in California and Kansas. Shortly before her death, Forassiepi had been suffering from diabetes and heart disease. Forassiepi was admitted to the coronary care unit at Wesley on May 26, 1999.

Forassiepi died of a heart attack at Wesley shortly before noon on May 30, 1999. An "ambu bag," which can cause postmortem bruising, was used on Forassiepi during the doctors' attempts to resuscitate her. However, Wesley personnel did not see any visible marks or cuts on Forassiepi's face after her death.

Rick Timsah, one of Forassiepi's other sons, and Jim and Doris Edwards, Ely's aunt and uncle, viewed Forassiepi's body in the coronary care unit at Wesley. Wesley personnel then placed Forassiepi in a body bag. A few hours later, Larry Lawrukiewicz, a Wesley security officer, picked up the body from the coronary care unit and took it to Wesley's morgue.

Shortly before Forassiepi's death, Timsah had purchased a preneed funeral insurance policy for his mother. Forassiepi's family had requested that her remains be cremated with only minimal preparation for viewing. On the day of Forassiepi's death, Timsah called Old Mission and spoke with Hitchcock, a licensed assistant funeral director. Timsah told Hitchcock of Forassiepi's death and informed Hitchcock of the need to retrieve the body from Wesley to prepare it for cremation.

Wesley personnel also called Old Mission to tell them Forassiepi's body was ready to be transported. Old Mission's funeral home manager, Marilyn Milleson, told Hitchcock to transport Forassiepi's body to DeVorss Mortuary for storage because Old Mission's refrigeration unit was full.

Hitchcock arrived at Wesley to pick up Forassiepi's body at 3:25 p.m. that afternoon. He unzipped the body bag, and put an identification tag on Forassiepi's leg. Hitchcock re-zipped the bag without looking at Forassiepi's head or face. He then loaded Forassiepi's body onto a mortuary cot, placing a pillow around her head and strapping her body to the cot. During this process, Lawrukiewicz looked at Forassiepi's face and did not see any cuts or wounds.

Hitchcock transported the body to DeVorss Mortuary. As he unloaded the cot and pushed it into the building, one of its wheels became stuck or struck a bump in the garage floor, causing the cot to tip to the right. Unable to keep the cot upright, it fell over, ending up with the cot laying on its side. With the help of a DeVorss employee, Hitchcock lifted the cot back up.

Timsah called Milleson the next morning and angrily complained about some of the provisions of the pre-need insurance policy. Milleson spoke to Old Mission's general manager, and they decided to offer the cremation at no charge.

Some time later, Hitchcock picked up Forassiepi's body from DeVorss and took it to Old Mission. When Hitchcock unzipped the body bag to prepare Forassiepi's body, he discovered a laceration to Forassiepi's left eyebrow, and saw blood on her face, head, and hair. Hitchcock asked Milleson to assist him in preparing the body.

That afternoon, Ely and other family members arrived at Old Mission to make the cremation and funeral arrangements. Milleson greeted the family and told them that the direct cremation would be provided free of charge, with the exception of taxes and the cost of certified copies of the death certificate, because of Timsah's dissatisfaction over the pre-need policy. Hitchcock finished making the arrangements with the family.

Hitchcock then asked if anyone would like to view the body. When Ely said he would, Hitchcock took him to the viewing room where he was left alone. Hitchcock did not tell Ely about the condition of Forassiepi's body. It was then that Ely saw the damage to Forassiepi's body.

Ely came out of the room and informed his family about the laceration. Members of the family grew angry and told Hitchcock and Milleson the laceration was not on the body when they viewed it at the hospital. Jim Edwards took pictures of the body. Ely helped him take the pictures by tipping his mother's head toward the camera, rolling the body, and unzipping the bag to look for other injuries. Ely then went to the bathroom and threw up.

Hitchcock and Milleson told Forassiepi's family they did not know how the laceration occurred, but it did not occur while in Old Mission's care. Ely does not know how or where the laceration occurred, when it occurred after her death, or what caused it.

Ely's injuries from this experience included throwing up once, incurring anger, recurring nightmares, crying, shaking, having difficulty removing the smell of formaldehyde from his hands, imagining the smell of formaldehyde on his hands, feeling shocked, and having gaps in his memory. He did not seek counseling and did not believe that he needed counseling. He did not see a mental health provider for any emotional difficulty he had after his experience. Ely did not miss any work due to his emotional distress from viewing the laceration.

The trial court found the material facts of the case were uncontroverted. It then adopted all of the arguments in Hitchcock's and Old Mission's motions for summary judgment as its conclusions of law in the case. Specifically, the trial court found that *Burgess v. Perdue*, 239 Kan. 473, 721 P.2d 239 (1986), controlled the outcome of the case. The trial court reasoned that Kansas does not recognize a claim for negligent interference with a dead body, but only for intentional, reckless, or malicious interference, and there was no such evidence in this case.

Even if Kansas did recognize a claim for negligent interference, the trial court found that Hitchcock's failure to warn Ely about his mother's injury did not rise to the level of negligent interference

with a dead body or negligent infliction of emotional distress. It also rejected Ely's claim of negligence per se, because any possible violations of Kansas Administrative Regulations were not the cause of the damage. Finally, it found no evidence of intentional conduct to support Ely's claim for outrage.

The trial court dismissed Ely's claims based on the defendants' motions for summary judgment. Our standard of review on appeal is well established:

" 'Summary judgment is appropriate when the pleading[s], depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. [Citation omitted.]' " *Mitchell v. City of Wichita*, 270 Kan. 56, 59, 12 P.3d 402 (2000) (quoting *Bergstrom v. Noah*, 266 Kan. 847, 871-72, 974 P.2d 531 [1999]).

There are essentially three wrongful acts Ely claims resulted in his emotional distress: (1) the intentional or negligent damage to his mother's body (interference with a dead body), (2) the release by Wesley of his mother's body to Hitchcock, and Hitchcock's transporting of Forassiepi's body, which allegedly violated Kansas administrative regulations (negligence per se), and (3) the failure of Hitchcock and Old Mission to warn Ely of the condition of his mother's body before he viewed it (outrage or negligent infliction of emotional distress). We will discuss these issues in that order.

*Negligent Interference with a Dead Body*

The trial court dismissed Ely's cause of action for negligent interference with his mother's body under the controlling case of *Burgess*, 239 Kan. 473. On appeal, Ely argues that a claim of negligent infliction of emotional distress due to the mishandling of his mother's body is possible if the facts are viewed in the light most

favorable to his case. A review of the law regarding the mishandling of dead bodies is helpful.

In *Alderman v. Ford*, 146 Kan. 698, 72 P.2d 981 (1937), the plaintiff sued a surgeon and his assistant for conducting an autopsy on her husband's body without her consent. Her petition alleged she had the exclusive right of sepulcher and possession of her husband's body in the condition it was in when he died. She claimed to have suffered from great mental anguish and hurt feelings, but suffered no physical injury. The trial court found the plaintiff's petition had failed to state a cause of action without an allegation of physical injury.

On appeal, the *Alderman* Court recognized that the plaintiff had the right to recover her husband's body in the condition it was in at his death so she could give it a proper burial. 146 Kan. at 701-02. As a result, the court held that any interference with this right by mutilating or disturbing the body was an actionable wrong. In addition, the plaintiff was not required to have suffered from physical injury to be able to recover damages for her mental suffering, which was a direct consequence of the invasion of her right. Thus, *Alderman* stands for the principle that physical injury is not required to be able to recover for mental distress due to interference with a dead body. 146 Kan. 698, Syl. ¶ 3.

In *Hamilton v. Individual Mausoleum Co.*, 149 Kan. 216, 86 P.2d 501 (1939), the plaintiff alleged that she had suffered mentally and physically due to the defendant's act of breaking into her mother's burial vault without her consent. The jury later determined that the defendant's acts were wanton, willful, malicious, and intentionally wrong. *Hamilton*, like *Alderman*, demonstrates that Kansas recognizes a cause of action for interference with a dead body.

Next, in *Hoard v. Shawnee Mission Medical Center*, 233 Kan. 267, 662 P.2d 1214 (1983), the plaintiffs sued the defendant for negligent infliction of emotional distress for informing them that their daughter was dead when she was actually in critical condition at another hospital. The court stated the general rule in Kansas was that negligent infliction of emotional distress is not actionable unless it results in physical injury to the plaintiff. Citing *Alderman* and *Hamilton*, the court noted that an exception to this general

rule had been recognized "where a close relative suffers emotional harm from the *negligent* mishandling of a corpse." (Emphasis added.) 233 Kan. at 274. It is not clear why the court believed that the defendants' activities in those cases were negligent rather than intentional. Nevertheless, it seems that at one time our Supreme Court believed there was a cause of action based on negligent mishandling of a dead body.

*Burgess*, 233 Kan. 473, however, marked a change in thought. In *Burgess*, the plaintiff's son was a resident of Kansas Neurological Institute (KNI). Shortly after the plaintiff's son died, the defendant Perdue asked the plaintiff's permission to conduct a full autopsy and to examine her son's brain. The plaintiff refused to grant permission for a full autopsy. When Perdue filled out the written authorization, however, he failed to limit the autopsy as the plaintiff had requested. Thus, a full autopsy was performed, and the coroner removed the brain of the plaintiff's son and sent it to KNI. Three weeks after her son's funeral, a doctor from KNI called the plaintiff, told her they had her son's brain, and inquired as to what they should do with it.

The plaintiff sued Perdue for negligent infliction of emotional distress and the State of Kansas for the outrageous and negligent act of its employee in calling the plaintiff and telling her that they had her son's brain. Although Burgess did not suffer any bodily injury as a result of the defendant's negligence, she maintained that emotional distress was sufficient when a defendant negligently mishandles a dead body.

In *Burgess*, our Supreme Court declined to adopt the position of the Restatement (Second) of Torts § 868 (1977), which stated: "One who intentionally, recklessly, or negligently removes, withholds, mutilates or operates upon the body of a dead person or prevents its proper interment or cremation is subject to liability." The court noted this was not the majority rule, which only allowed recovery if the act was intentional or malicious, and if that act was the proximate cause of the mental anguish or physical illness or both of the plaintiff. 233 Kan. at 480.

The court then observed that *Alderman* and *Hamilton* involved conduct other than negligence. 233 Kan. at 480. In its syllabus, the court succinctly stated the following rule:

"For an individual to be liable for emotional distress for interfering with a dead body, the act must be intentional or malicious, as opposed to negligent, interference with the plaintiff's right to the body and the interference must be the proximate cause of the mental anguish and/or physical illness of the plaintiff." 239 Kan. 473, Syl. ¶ 3.

Thus, our Supreme Court, in *Burgess,* determined that summary judgment in favor of the defendants was appropriate.

In seeking a reversal of the trial court on the issue of negligent mishandling of his mother's body, Ely is asking this court to ignore the clear rule established in *Burgess. Burgess* unequivocally stated that to recover for interference with a dead body, the interference must be intentional. This court is duty bound to follow our Supreme Court precedent, absent some indication the court is departing from its previous position. *Gadberry v. R.L. Polk & Co.,* 25 Kan. App. 2d 800, 808, 975 P.2d 807 (1998). Reviewing the facts in the light most favorable to Ely, the trial court correctly entered summary judgment in favor of the defendants on the issue of negligent interference with a dead body.

## *Intentional Interference with a Dead Body*

Ely also maintains that a jury could infer Hitchcock's mishandling of the body was intentional and malicious.

The evidence presented to the trial court indicated that Hitchcock accidently let the cot carrying Forassiepi's body fall to its side. It cannot be said that this act was intentional. However, Ely also argues that, based on the evidence, a jury could infer that Hitchcock intentionally abused Forassiepi's body in order to avenge himself of Timsah's rough treatment of him. Ely states in the section of his brief dedicated to his outrage claim:

"The jury could infer that Mr. Hitchcock took his anger towards the family out on their mother. The jury could infer that Mr. Hitchcock choked Mrs. Forassiepi causing the two red marks on her neck. The jury could infer Hitchcock hit Mrs. Forassiepi, causing a laceration over her right eye. The jury could infer he bruised her nose and cheek, out of anger against the family who was treating him badly."

In support of his argument, Ely points to Hitchcock's testimony which said he had received an angry telephone call from Timsah shortly before retrieving Forassiepi's body. Ely's brief also cites

parts of Lawrukiewicz's testimony that indicated that Hitchcock was unhappy with Forassiepi's family when he retrieved Forassiepi's body from Wesley.

Nevertheless, this evidence was not presented to the trial court. Ely did not tell the court that Hitchcock may have been angry when he retrieved Forassiepi's body. Lawrukiewicz's deposition was not provided to the trial court in full but was added to the record on appeal at a later date.

In their memorandum in support of their motion for summary judgment, Hitchcock and Old Mission stated they assumed the outrage claim was "based on conduct other than allegedly causing the laceration to the eyebrow, for that claim would most appropriately fall under the *Burgess* rule." The plaintiff did not dispute this statement in his response. To the contrary, during the hearing on the motions for summary judgment, Ely acknowledged there were no allegations that such behavior took place: "Now, again, there is no allegation that anybody punched Ms. Forassiepi, nobody struck her with an object."

Ely cannot concede this point at the trial court level and then argue on appeal that it erred by failing to consider Hitchcock might have acted intentionally. Issues not raised before the trial court cannot be raised on appeal. *Dalmasso v. Dalmasso*, 269 Kan. 752, 765, 9 P.3d 551 (2000).

Without any allegations of reasons for Hitchcock to act intentionally, a jury could not reasonably infer that Hitchcock intentionally abused Forassiepi's body. See *Clevenger v. Catholic Social Service of the Archdiocese of Kansas City*, 21 Kan. App. 2d 521, 530, 901 P.2d 529 (1995) (holding summary judgment on claim of outrage was appropriate when no evidence of any motive for defendant to act maliciously was presented to the court). As a result, Ely's argument that a jury could have found that Hitchcock's mishandling of the body was intentional and malicious fails.

*Right of Sepulcher*

Ely also argues that Hitchcock and Old Mission failed to ask the trial court for summary judgment on his claim of sepulcher. Therefore, Ely maintains that because his sepulcher claim against Hitch-

cock and Old Mission was not dismissed, the claim is still alive at the trial court level, rendering his appeal premature.

After the parties' arguments at the summary judgment hearing, the trial court announced it was adopting all of the arguments and conclusions of law made by Hitchcock and Old Mission in their memorandum in support of their motion for summary judgment. The trial court also commented that its ruling allowed all the defendants to be dismissed from the lawsuit. Thus, the trial court believed all of the plaintiff's claims had been addressed.

"Sepulcher" is not defined in Black's Law Dictionary (7th ed. 1999). It is defined in the American Heritage Dictionary as a burial vault or interment. American Heritage Dictionary 1119 (2d Ed. 1985). Ely's claim of the right of sepulcher appears to have been derived from *Alderman,* where the court recognized the plaintiff's right to recover her husband's body in its condition at his death so she could give it a proper burial.

*Alderman* also explained "that this is not a case where recovery depends on negligence." 146 Kan. at 699. The plaintiff interprets this clause to mean that "[t]he right of sepulcher is not a negligence claim." Thus, Ely reads *Alderman* to mean that the right of sepulcher does not depend on intent or injury.

As demonstrated in *Burgess,* this is simply not correct. The defendants in *Burgess* interfered with the plaintiff's right to her son's body, yet she was not entitled to recover because the defendants' interference was not intentional. While the family of a decedent may have a right of sepulcher for the body of a decedent, recovery for the violation of that right seems to be based on expenses incurred in correcting the problem and emotional distress or physical injury if the conduct was intentional. As a result, the right of sepulcher is not a separate legal claim. Because the trial court did not have to specifically address this issue, this issue on appeal is not properly before this court. As a result, Ely's argument fails.

Next, Ely argues that the district court erred in dismissing his claim of negligence per se for violations of Kansas Administrative Regulations. Specifically, he claims that Hitchcock and Old Mission violated K.A.R. 63-5-1, which describes "abuse or disrespect in the

handling of a dead human body" as "[u]nprofessional or dishonorable conduct." Ely also cites K.A.R. 63-3-11, which states:

"A dead human body shall not be transported by private conveyance or common carrier until the following conditions are met. (a) Any unembalmed body released by the family or proper authority, . . . may be transported by private conveyance within the state of Kansas if:

"(1) A certificate of death has been filed according to laws and regulations set forth by the Kansas state department of health and environment; and

"(2) after the body has been released to a funeral director, any transportation is supervised personally by the funeral director."

Ely argues that because Hitchcock was only a licensed assistant funeral director, rather than a funeral director, he could not transport Forassiepi's body without violating this regulation. Furthermore, he points out, Wesley had not issued a certificate of death when Forassiepi's body was transported. Thus, according to Ely, Wesley was negligent per se in releasing the decedent's body to a funeral director before filing a death certificate, and Hitchcock and Old Mission were negligent per se by not having a funeral director transport the decedent's body.

The elements of negligence per se are: "(1) A violation of a statute, ordinance or regulation, and (2) the violation must be the cause of the damages resulting therefrom." *OMI Holdings, Inc. v. Howell*, 260 Kan. 305, 339, 918 P.2d 1274 (1996). In addition, Ely must also establish that the legislature intended to create an individual right of action for injury arising out of the violation. *Kansas State Bank & Tr. Co. v. Specialized Transportation Services, Inc.*, 249 Kan. 348, 370-71, 819 P.2d 587 (1991).

The difference between negligence and negligence per se is the method of ascertainment. Negligence requires the factfinder to make a determination from the evidence. Negligence per se requires the factfinder to determine whether there was a commission or omission of a specific act prohibited or required, which results from violation of a specific law or ordinance. *Kerns v. G.A.C., Inc.*, 255 Kan. 264, 281, 875 P.2d 949 (1994).

Even if the regulations were violated, any violation was not the proximate cause of Ely's injury. The fact that a death certificate had not been filed had nothing to do with the damage to Foras-

siepi's body. Neither can Ely show that the damage to Forassiepi's body would have been prevented if someone else had transported the body.

Most importantly, *Burgess* holds that no cause of action exists for a claim of negligent interference with a dead body. Ely's claim of negligence per se is based on the alleged mishandling of his mother's body. Because Ely cannot circumvent the holding in *Burgess* under a theory of negligence per se, the trial court did not err in dismissing this part of Ely's case.

Finally, Ely argues that the trial court erred in dismissing his claim for outrage and negligent infliction of emotional distress when the defendants failed to warn him of the damaged condition of his mother's body before he viewed it.

### Outrage

An actionable claim of outrage contains four elements:

"(1) The conduct of the defendant was intentional or in reckless disregard of the plaintiff; (2) the conduct was extreme and outrageous; (3) there was a causal connection between the defendant's conduct and the plaintiff's mental distress; and (4) the plaintiff's mental distress was extreme and severe. [Citation omitted.]" *Miller v. Sloan, Listrom, Eisenbarth, Sloan & Glassman*, 267 Kan. 245, 257, 978 P.2d 922 (1999).

Before addressing these elements, however, the trial court must determine whether the plaintiff's claim meets two threshold requirements: First, the defendant's conduct must be "so outrageous in character and so extreme in degree as to go beyond the bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized society. [Citation omitted.]" *Miller*, 267 Kan. at 257. Second, the emotional distress suffered by the plaintiff must be "of such extreme degree the law must intervene because the distress inflicted was so severe that no reasonable person should be expected to endure it. [Citation omitted.]" *Miller*, 267 Kan. at 257.

The trial court found that there was no evidence of intentional conduct to support a claim for outrage and that the plaintiff had failed to meet the rather stringent requirements for an actionable outrage claim.

Ely maintains that Hitchcock's and Old Mission's act of allowing him to see his mother's body in its damaged condition sufficiently states a claim of outrage. In *Burgess*, the plaintiff's case included an outrage claim due to the doctor's act of calling her and telling her that they " 'had her son's brain in a jar.' " 239 Kan. at 475. The court found that while the comment was tactless, it was not so extreme in degree as to be regarded as atrocious, outside the bounds of human decency, or utterly intolerable in a civilized community. 239 Kan. at 477. The doctor had telephoned the plaintiff to resolve the error that had been made.

Here, while the defendants might have asked Wesley or the family how Forassiepi died, giving the family the opportunity to see the body was not extreme and outrageous. Furthermore, there was no evidence that Hitchcock acted intentionally or maliciously.

As to the outrage claim against Wesley, Ely barely mentions Wesley and provides no discussion about Wesley's allegedly outrageous actions. " 'Where the appellant fails to brief an issue, that issue is waived or abandoned.' " *Bergstrom v. Noah*, 266 Kan. 847, 873, 974 P.2d 531 (1999) (quoting *Pope v. Ransdell*, 251 Kan. 112, 119, 833 P.2d 965 [1992]). Because the extreme and outrageous element cannot be met, the trial court did not err in granting summary judgment on all of Ely's outrage claims.

*Negligent Infliction of Emotional Distress*

Ely also asserts that he has a separate claim for negligent infliction of emotional distress based on Hitchcock's and Old Mission's failure to warn him about the body's condition before he viewed it. However, this seems to be the same claim as the negligent interference with the right to a dead body. In *Burgess*, although the plaintiff claimed the doctor's act of calling her was outrageous and negligent, the court did not separately analyze a claim for negligent infliction of emotional distress for the telephone call.

To be entitled to recovery for negligent infliction of emotional distress, the plaintiff must demonstrate that he has suffered from some actual physical injury or impact as a result. *Hoard v. Shawnee Mission Medical Center*, 233 Kan. 267, Syl. ¶ 1. The reason for this rule is to prevent recovery for feigned distress or distress com-

monly experienced in everyday life. *Hoard*, 233 Kan. at 274. Generalized physical symptoms of emotional distress such as headaches and insomnia are insufficient to state a cause of action. *Hopkins v. State*, 237 Kan. 601, 612-13, 702 P.2d 311 (1985).

In *Anderson v. Scheffler*, 242 Kan. 857, 861, 752 P.2d 667 (1988), the court found that recurring nightmares and visiting a doctor for depression were not sufficient physical manifestations to state a cause of action. In *Reynolds v. Highland Manor, Inc.*, 24 Kan. App. 2d 859, 861, 954 P.2d 11 (1998), the court found that the plaintiff who had suffered from headaches, diarrhea, and nausea had not presented evidence of significant physical injury.

Here, Ely claims that after helping his uncle take photographs of his mother's body, he vomited. Although vomiting may be the physical impact that a case requires, Ely did not seek counseling or any sort of help for his alleged trauma. As a result, Ely has not demonstrated a significant physical injury.

Affirmed.