NOT DESIGNATED FOR PUBLICATION

No. 123,289

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

REBECCA STRUTHERS and CARMEN BOULTON,
as Executors of the Estate of Gary Lane,
*Appellants*,

v.

SAMUEL Y. HO, M.D., AMARINDER SINGH, M.D.,
and SOUND INPATIENT PHYSICIANS, INC.,
*Appellees*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; THOMAS G. LUEDKE, judge. Opinion filed January 14, 2022. Affirmed.

*Mark Beam-Ward*, of Beam-Ward, Kruse, Wilson & Fletes, LLC, of Overland Park, for appellants.

*John Wesley Smith*, of Simpson, Logback, Lynch, Norris, P.A., of Overland Park, for appellees.

Before BRUNS, P.J., GREEN and ISHERWOOD, JJ.

PER CURIAM: Gary Lane (now deceased) maintains that he suffered emotional injury because healthcare providers did not timely complete his wife's death certificate. A notice of death has been filed in this appeal for Lane. This court has entered an order substituting Rebecca Struthers and Carmen Boulton as executors for the Estate of Gary Lane.

1

Lane sued Samuel Ho, M.D., Amarinder Singh, M.D., and Sound Inpatient Physicians, LLC (Sound Physicians) for interference with a dead body. At the end of discovery, the defendants moved for summary judgment, which the trial court granted. On appeal, Lane alleges multiple trial court errors. For the reasons discussed later, we reject Lane's arguments and, thus, we affirm.

FACTS

Lane was the spouse of decedent Patricia Lane. Struthers is Patricia's daughter and was dismissed as a plaintiff in 2019.

Patricia presented to the University of Kansas Health System, St. Francis Campus (St. Francis) in Topeka on November 8, 2017. Her diagnosis was that she had suffered an aortic aneurysm. Patricia declined surgical intervention.

Ho and Singh were licensed physicians and healthcare providers who were employed by Sound Physicians to practice as hospitalists at St. Francis. Ho was one of five hospitalists on duty that day at St. Francis. He met Patricia when he made rounds on patients in the morning on November 9, 2017. Patricia died at 6:08 p.m. on November 9, 2017, surrounded by family.

A nurse practitioner, Jeff Black, pronounced Patricia dead. Black also authored a discharge summary in St. Francis' electronic medical records system. Ho was not present when Patricia died because he had gone off duty. A registered nurse created an expired patient summary which listed Singh as the attending provider to sign the death certificate. But on November 11, 2017, Ho cosigned the discharge summary that Black authored. Ho was not aware that he would also be responsible for completing the death certificate because in a large practice the physician who signs the discharge summary may not be the same physician responsible for completing the death certificate.

2

On November 10, 2017, Penwell-Gabel Cremations, Funerals & Receptions—Mid-town Chapel (the funeral home) initiated an electronic case for completing Patricia's death certificate within the Kansas Electronic Death Registration System. Funeral director Heidi Greve was responsible for the cremation arrangements for Patricia. An unknown employee of St. Francis told Greve that Patricia died and that Singh was the physician who should complete the death certificate. Greve began filling out Patricia's death certificate in the registration system, listing Singh as the physician to complete the death certificate.

When a funeral home assigns a death certificate to a physician, the electronic death registration system sends an auto-generated notification to the e-mail address on file for the physician. An auto-generated notification should have been sent to Singh on November 10, 2017. During depositions, Singh did not recall receiving any notification that a death certificate for Patricia was pending and assigned to him. He also looked back through his e-mails before his deposition and did not find any notification related to Patricia's death certificate. Singh testified that he sometimes had issues receiving notifications, stating "a lot of times they can get assigned to different providers." But he could not say how frequently an error occurs.

Diana Baldry, the chief of registration and amendments with the Kansas Department of Health and Environment, Office of Vital Statistics, testified that once or twice a month her office receives phone calls from physicians saying that they did not get an auto-generated notification from the system. According to Baldry, the system does not save auto-generated notifications, so she could not go back and see whether Ho or Singh received e-mail notices. The electronic death registration system shows when the case was assigned to a physician but does not confirm that e-mail notifications were sent.

Carol Munoz was employed by Sound Physicians as the hospitalist coordinator at St. Francis with normal working hours of 7 a.m. to 3:30 p.m., Monday through Friday.

Her responsibilities included answering the hospitalists' phone line. The hospitalists' phone line was directed to Munoz' desk and was not answered by anyone else. If she was not at her desk, calls to the hospitalists' phone line went to voicemail. If someone called for a physician, Munoz took a message and then contacted the physician by text, call, or e-mail. If a funeral home did not know who to assign the death certificate to, Munoz told the funeral home which physician was responsible for filling out the death certificate. Munoz would contact a physician if she learned that the physician had not completed a death certificate.

Greve called Munoz on November 14, 2017, because Greve could not proceed with cremation without the physician's portion of the death certificate completed. During the call, Munoz looked up the death certificate and told Greve that it was incorrectly assigned to Singh but should be assigned to Ho. Greve then corrected the certificate to name Ho as the physician assigned to complete it. Munoz did not tell Singh or Ho about this phone call or Patricia's death certificate.

When a death certificate is reassigned to a new physician, an auto-generated e-mail notification should be sent to the new physician. Munoz is also registered to receive notifications about pending death certificates assigned to physicians employed by Sound Physicians. Munoz did not recall ever receiving any notification of a pending death certificate for Patricia. Munoz does not normally delete these notifications. But when she reviewed her e-mail from November 2017, she could not find any notifications of a death certificate for Patricia. Munoz testified that she heard no previous complaints about Singh or Ho completing death certificates, stating, "The only time we have a problem is when the State of Kansas doesn't get the notification sent."

Due to medical issues, Lane never personally attempted to call Ho, Singh, or anyone at St. Francis about completing his wife's death certificate. Lane instead relied on Struthers to make all phone calls about her mother's death certificate and arrangements

for the cremation and funeral. On November 16, 2017, Struthers tried to reach Ho directly by calling the hospitalists' phone line. Struthers did not reach anyone but left a voicemail asking for a call back. Struthers called the hospitalists' number twice on November 20, 2017, again reaching no one but leaving a voicemail. Struthers made both calls after 3:30 p.m., when Munoz would have been off duty.

After failing to reach anyone on the hospitalists' phone line, Struthers called St. Francis' general phone number and reached someone with whom to speak about Patricia's death certificate. On November 20, 2017, at approximately 4:39 p.m., St. Francis' Clinical Resource Manager, Shari Brockman, sent Munoz an e-mail saying that Struthers called and that Ho needed to sign Patricia's death certificate. Munoz received this e-mail on her arrival at work on November 21, 2017. In response to Brockman's e-mail, Munoz called and e-mailed Ho.

Ho did not recall receiving any e-mail notification from the electronic death registration system about Patricia's death certificate before November 21, 2017. Ho testified that Munoz did not contact him about Patricia's death certificate until November 21, 2017. That morning, Ho told Munoz that he could not see the death certificate and that he was headed out of town, but he would come in as soon as he could to complete the death certificate. Munoz followed up her phone call to Ho by forwarding the e-mail from Brockman about completing the death certificate. Ho came into the office and completed the medical portion of Patricia's death certificate at or about 12:04 p.m. on November 21, 2017.

Meanwhile, on November 20, 2017, Struthers complained to the Kansas Board of Healing Arts (Board) that Ho had not completed her mother's death certificate. She stated her understanding that Ho is required to sign a death certificate within three days and stated that the delay was "'negligence on both his and the hospital's part and is inexcusable.'" Struthers explained her use of "negligence" referred to the fact that

"nobody got back with us" and no one signed the death certificate. Struthers did not claim that anyone intended to delay the signing of the death certificate. She also did not allege that Ho had any motive or reason to not sign the death certificate. Similarly, Lane did not know why his wife's death certificate was delayed, but he did not believe that anyone intentionally refused to sign it or intended to delay cremation.

After investigating Struthers' complaint, the Board called her and told her that the delay was caused by a St. Francis employee incorrectly assigning Singh to complete the death certificate and that the Board would take no action against Ho.

Lane testified that he suffered no physical injuries because of the delay in signing the death certificate. Instead, he alleged that he "missed a bunch of sleep . . . before they signed it." He also had intermittent nightmares about Patricia's body and cremation, but he had not sought mental health treatment.

At the close of discovery, Sound Physicians moved for summary judgment, which the trial court granted.

Lane timely appeals.

ANALYSIS

*Did the trial court fail to view the evidence in the light most favorable to Lane?*

Lane argues that the trial court misapplied the summary judgment standard because it failed to view the evidence in the light most favorable to him. The defendants argue that the trial court resolved all facts and inferences in Lane's favor. Because the trial court made all reasonable inferences in Lane's favor, this court should affirm.

"Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, admissions on file, and supporting affidavits show that no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law. The district court must resolve all facts and reasonable inferences drawn from the evidence in favor of the party against whom the ruling [is] sought. When opposing summary judgment, a party must produce evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issue in the case. Appellate courts apply the same rules and, where they find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment is inappropriate. Appellate review of the legal effect of undisputed facts is de novo. [Citation omitted.]" *GFTLenexa, LLC v. City of Lenexa*, 310 Kan. 976, 981-82, 453 P.3d 304 (2019).

When the controlling facts are based on the parties' joint stipulation, an appellate court determines de novo whether the moving party is entitled to a judgment as a matter of law. *Stewart Title of the Midwest v. Reece & Nichols Realtors*, 294 Kan. 553, 557, 276 P.3d 188 (2012). A party opposing summary judgment may not rest merely on allegations but must set forth specific facts to support its position. An inference cannot be based on evidence which is too uncertain or speculative or which raises merely a conjecture or possibility. *Seitz v. Lawrence Bank*, 36 Kan. App. 2d 283, 289-90, 138 P.3d 388 (2006).

An issue of fact is not genuine unless it has legal controlling force as to the controlling issue. A disputed question of fact which is immaterial to the issue does not preclude summary judgment. In other words, if the disputed fact, however resolved, could not affect the judgment, it does not present a "genuine issue" for purposes of summary judgment. *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 934, 296 P.3d 1106 (2013); *Foxfield Villa Associates v. Robben*, 57 Kan. App. 2d 122, 126, 449 P.3d 1210 (2019).

Lane's arguments focus on two fact questions: (1) Did Ho or Munoz receive an auto-generated e-mail notification to complete Patricia's death certificate? (2) Did Munoz tell Ho to complete Patricia's death certificate?

*Auto-generated e-mail notifications*

The trial court determined that Lane did not produce evidence that Ho received a notification from the automated system. In particular, the trial court pointed out the following:

> "The issue of whether Dr. Ho received notification of his duty to complete the death certificate on November 14, 2017 is disputed. On the one hand is the evidence of the reliability of the automated notification combined with Dr. Ho's testimony that he had previously experienced no problems with receiving similar notifications with the automated system. On the other is Dr. Ho's testimony that he did not receive the notification and he had no records to indicate the notice was received. Additionally, other than the presumption of regularity of the automated notice, there is no other evidence to either confirm or refute the receipt of the notice. The value of this evidence, standing alone, would only provide marginal support for Plaintiff's claim and provide insufficient support for the element of intent."

The trial court concluded that Lane disputed a material fact without producing evidence to support his disputation. Ho testified that he did not receive notification to complete Patricia's death certificate. In response, Lane points to evidence that the electronic death registration system is generally reliable. On this basis, Lane asserts that the trial court should have, for purposes of summary judgment, assumed that Ho received a notification.

But Baldry testified that her office receives phone calls once or twice a month from physicians saying they have not received notifications. Munoz testified that the only time there is a problem with completing death certificates is when the system fails to send

a notification. Singh's testimony suggested infrequent errors in an otherwise reliable system. Nevertheless, Lane asserts that the trial court should have assumed that Ho received an e-mail. Lane here asks the trial court to make an inference beyond what the evidence supported. For example, if the evidence showed that the death registration system sent an e-mail to Ho and he received the auto-generated e-mail notification to complete Patricia's death certificate, these facts would still not show whether Ho intentionally disregarded the e-mail notification. Lane would need some further evidence to establish the intentional interference with a dead body requirement, which we will discuss later in this opinion.

Lane also points to the evidence that Munoz was set up to receive copies of the auto-generated notices which went to physicians. The trial court noted Munoz' testimony that she ordinarily received notifications but had no record of receiving one for Patricia's death certificate. Lane argues that the trial court should have inferred that Munoz had received an e-mail notification, but she intentionally delayed Patricia's cremation. Nevertheless, just because Munoz was set up to receive copies of the auto-generated notices which went to physicians, these facts alone do not prove that Munoz received an e-mail notification for Patricia's death certificate, and she intentionally delayed Patricia's cremation.

In relying on this evidence, Lane commits a logical non sequitur; it does not follow. Lane here asks the trial court to do more than just view the evidence in the light most favorable to him. He also asks the trial court to make inferences not directly supported by any evidence. Even if the facts showed that Munoz had received an e-mail notification for Patricia's death certificate, these facts do not establish if she intentionally disregarded or deleted the e-mail notification.

When discussing the auto-generated notifications, Lane points out that Ho completed the discharge summary for Patricia. Lane implies that a notification would

therefore be irrelevant because Ho would know to complete the death certificate even if he did not receive an e-mail notification. But the facts contradict Lane's assertion. The only fact on this point is Ho's testimony that the physician who completes the discharge summary may or may not be the physician who completes the death certificate. The trial court viewed the evidence correctly when it did not infer that Ho knew about the death certificate from the fact that he signed the discharge summary. The trial court's inference accurately reflects the evidence that the two documents are not necessarily connected to form the conclusion that Ho would know to complete the death certificate for Patricia.

For example, Lane maintains the following: Ho completed the discharge summary for Patricia and therefore Ho knew he would need to complete Patricia's death certificate even if he did not receive an e-mail notification for Patricia's death certificate. Lane literally begs the question. This occurs when a claim is dependent on another claim that is implicitly assumed but not established in the argument. Lane here enlarges on the claim that Ho completed the discharge summary for Patricia to conclude that Ho would know he was responsible to complete the death certificate. On the face of it, there is no connection between the claim (Ho completed the discharge summary for Patricia) and the conclusion (Ho would know he was responsible to complete Patricia's death certificate). The only disputed claim was begged, namely, whether Ho would know he was responsible to complete Patricia's death certificate. And thus, Lane's disputed claim falls short of the proof necessary to establish his conclusion.

*The hospitalist coordinator's conversation with the hospitalist*

Lane argues that the trial court should have presumed that Munoz directly told Ho about the death certificate. The undisputed evidence shows that the funeral home incorrectly assigned the death certificate to Singh on November 10, 2017, the day after Patricia died. The funeral home reassigned the death certificate to Ho on November 14,

10

2017. Lane claims that, even if Ho did not receive a notification, Munoz told him that the funeral home reassigned the death certificate to him.

The trial court noted that the evidence on this point did not establish what Lane claims it established. The evidence that Munoz spoke with Ho does not come from either Munoz or Ho. Lane points to Greve's affidavit to establish this fact: "[O]n the occasions that I was able to speak to Carol Munoz, she told me that she was passing the requests for the completion of the death certificate to the physicians." Thus, the evidence in the record is that the hospitalist coordinator told the funeral director that she would speak with the hospitalists. Lane contends that the trial court should have inferred that the hospitalist coordinator did speak with the hospitalists, for purposes of summary judgment.

The first difficulty with Lane's argument is that the event has no date. Setting aside issues of hearsay and accuracy, Greve's affidavit does not say when this conversation occurred. Ho's testimony was that Munoz spoke to him on November 21, 2017, and he completed the death certificate on November 21, 2017. Lane argues that the trial court should have inferred from Greve's affidavit that Ho knew about the death certificate earlier, although Lane does not argue for a specific date. The trial court correctly disregarded Lane's assertion in view of the stipulated facts.

Lane stipulated to the uncontroverted fact that "Ms. Munoz did not communicate with Dr. Singh or Dr. Ho about this telephone call from the Funeral Home, or the reassignment of Ms. Lane's [electronic death certificate] case at this time." Also, "Dr. Ho was not made aware of any contacts or attempted contacts from the funeral home or family members of Ms. Lane regarding the completion of the death certificate until November 21, 2017." Nevertheless, the trial court viewed the evidence in favor of Lane by placing a conversation between Munoz and Ho as early as possible.

In that regard, the trial court specified that the evidence showed that Ho had knowledge of the death certificate on November 21, or possibly November 20. The trial court bases its supposition of November 20 on Munoz' testimony. She said that she knew Ho was out of town during that period. She guessed that she knew this from a conversation with Ho that she possibly had on November 20. The deposition transcript, read in context, shows that the conversation that Munoz described was Ho telling Munoz that he was going out of town. Nothing in the testimony directly showed that the conversation included Patricia's death certificate. But the trial court surmised that Munoz could have mentioned the death certificate and therefore Ho would have known as early as November 20 about the certificate: "The evidence establishing Dr. Ho's direct knowledge is only persuasive, at the earliest, by November 20, [2017]." The trial court's memorandum decision shows the trial court viewing the evidence in Lane's favor to fill in an unsupplied date.

In addition to the date, the trial court noted that the evidence Lane points to suffers from problems of hearsay and lack of foundation. Greve's affidavit states that Munoz promised to speak to the physicians. But the uncontroverted facts stated that Munoz did not speak with either Ho or Singh. The trial court correctly determined that, whether Munoz told Greve she would, Munoz did not notify Ho or Singh about completing the death certificate.

In sum, the trial court viewed the evidence in the light most favorable to Lane. Where the evidence allowed for it, the trial court drew all reasonable inferences in Lane's favor.

*Did the trial court err by granting summary judgment for lack of evidence of intent or malice?*

Lane argues that Ho, Singh, and Sound Physicians intentionally interfered with the disposition of Patricia's body. The defendants assert that summary judgment was appropriate because Lane failed to produce evidence of intent or malice.

Lane's petition alleged facts but did not state a cause of action. In ruling on prior motions, the trial court liberally construed the petition to allow Lane to move forward with more than one potential claim. Lane's appellate brief names the tort, but the parties do not agree on what elements Lane must plead and prove. A history of the tort of emotional distress for interfering with a dead body is helpful to alleviate confusion.

Kansas law has always required that a defendant intentionally, rather than negligently, interfere with a dead body for the defendant to be liable. In *Alderman v. Ford*, 146 Kan. 698, 72 P.2d 981 (1937), a surgeon and his assistant performed an autopsy on a dead body without the widow's consent. The widow's petition asserted her right to possession of her husband's body in the condition it was in when he died. She alleged "'mental anguish and depression of spirits, and insult to her feelings.'" 146 Kan. at 703.

On appeal, the *Alderman* court held that the widow had the right to bury her husband in his original condition because (1) the Legislature had enacted a series of statutes protecting burial rights and (2) a rule to protect burial rights "is based on the tenets and practice of a Christian people." 146 Kan. at 701. Despite the *Alderman* court's bizarre implication that the 5.4 billion non-Christians on Earth do not care about their dead, the court held that a plaintiff could recover for emotional distress caused by intentionally mutilating or disturbing the body. Reversing the trial court, the *Alderman* court ruled that the plaintiff did not need to suffer physical injury to recover damages for

13

her mental suffering. The *Alderman* court referred to the tort as an "unauthorized autopsy" and remanded for trial but did not discuss the amount or type of emotional distress the widow would need to show at trial. 146 Kan. at 700.

In *Hamilton v. Individual Mausoleum Co.*, 149 Kan. 216, 86 P.2d 501 (1939), employees of the defendant broke into a leaky burial vault without permission to transfer a wet and damaged casket into a new vault. The plaintiff alleged that her mother's body was moved without her consent, and she suffered mentally and physically as a result. The *Hamilton* court ruled that the plaintiff did not need to join her siblings to the suit, stating: "The distress, anguish and suffering cause by this act are peculiar to her. Perhaps it did not disturb her brothers at all. We cannot pass on that question in this case." 149 Kan. at 220. The *Hamilton* court ruled that the plaintiff could sustain this unnamed cause of action because the defendant acted willfully, wrongfully, maliciously, and its conduct was wanton. 149 Kan. at 222.

The Restatement of Torts § 868 (1939) recognized a tort for interference with dead bodies only when the interference was intentional or wanton. But the Restatement (Second) of Torts § 868 (1977) describes the tort as follows: "One who intentionally, recklessly or negligently removes, withholds, mutilates or operates upon the body of a dead person or prevents its proper interment or cremation is subject to liability to a member of the family of the deceased who is entitled to the disposition of the body." The Restatement (Second) does not include emotional distress as an element of the tort.

But comment a to § 868 states the following:

"One who is entitled to the disposition of the body of a deceased person has a cause of action in tort against one who intentionally, recklessly or negligently mistreats or improperly deals with the body, or prevents its proper burial or cremation. The technical basis of the cause of action is the interference with the exclusive right of control of the

14

body, which frequently has been called by the courts a 'property' or a 'quasi-property' right. This does not, however, fit very well into the category of property, since the body ordinarily cannot be sold or transferred, has no utility and can be used only for the one purpose of interment or cremation. In practice the technical right has served as a mere peg upon which to hang damages for the mental distress inflicted upon the survivor; and in reality the cause of action has been exclusively one for the mental distress. . . . There is no need to show physical consequences of the mental distress." Restatement (Second) of Torts § 868, comment a (1977).

But our Supreme Court noted that the Restatement gives the minority rule and rejected this rule in *Burgess v. Perdue*, 239 Kan. 473, 480-81, 721 P.2d 239 (1986). The deceased was a resident of the Kansas Neurological Institute (KNI). The mother, Mary A. Burgess, agreed only to a partial autopsy of her son. Dr. W. Lang Perdue told her that KNI would want to examine her son's brain, but Burgess refused permission. When Perdue filled out the autopsy form, he failed to alert the county coroner that Burgess consented to only a limited autopsy. The assistant county coroner performed a full autopsy, including sending the brain to KNI. Our Supreme Court defined the tort as follows:

"For an individual to be liable for emotional distress for interfering with a dead body, the act must be intentional or malicious, as opposed to negligent, interference with the plaintiff's right to the body and the interference must be the proximate cause of the mental anguish and/or physical illness of the plaintiff." *Burgess*, 239 Kan. 473, Syl. ¶ 3.

The *Burgess* court affirmed summary judgment because Burgess had only alleged that Perdue was negligent. But Kansas did not follow the Restatement rule allowing for recovery due to negligent interference with a dead body. The *Burgess* court ruled that, in Kansas, the tort of emotional distress for interfering with a dead body requires intentional interference.239 Kan. at 480-81.

15

In *Ely v. Hitchcock*, 30 Kan. App. 2d 1276, 58 P.3d 116 (2002), David M. Ely sued because his mother's body was damaged during transport. The assistant funeral director caught one of the wheels of a cot on a bump in the floor in the mortuary's garage. The cot tipped over, resulting in a laceration and blood on his mother's face. On appeal, this court held that summary judgment was appropriate because the evidence showed that the cot fell accidentally and there was no evidence that the assistant funeral director intentionally battered the body of plaintiff's mother. 30 Kan. App. 2d at 1284-85.

In *Dill v. Barnett Funeral Home, Inc.*, No. 90,653, 2004 WL 292124 (Kan. App. 2004) (unpublished opinion), Patricia A. Dill sued a funeral home for, among other things, embalming her husband's body without her consent and negligently directing his burial to the wrong plot. Dill claimed a lack of sleep, recurring dreams, and general fatigue, but did not see professional medical assistance. The *Dill* court ruled that these claims were inadequate to support an action for negligent infliction of emotional distress, which requires that a plaintiff demonstrate physical injury or impact from the emotional distress. 2004 WL 292124, at *3. The *Dill* court also noted that a cause of action for interference with a dead body provides an exception to the physical symptom requirement but requires intentional conduct. The record did not have evidence of intentional interference with the dead body. Also, the *Dill* court discussed Dill's claim of intentional infliction of emotional distress, which does not require physical symptoms. But the evidence of Dill's symptoms of emotional distress were insufficient to support either claim. 2004 WL 292124, at *8 (citing *Ely*, 30 Kan. App. 2d at 1289-90).

In *Dana v. Heartland Management Co.*, 48 Kan. App. 2d 1048, 301 P.3d 772 (2013), a funeral home mislabeled an urn, resulting in misplacement of a decedent's remains. The decedent's father and twin brother sued the funeral home for the resulting delay in locating the remains, which were not found until after the wake and funeral service were held with an empty urn. The *Dana* court cited *Burgess* and *Ely* when it stated: "Kansas recognizes the tort of interference with a dead body." 48 Kan. App. 2d at

16

1060. In fact, *Burgess* rejected the tort that Restatement (Second) calls interference with a dead body. Instead, it may have been more precise for the *Dana* court to refer to the tort recognized in Kansas as emotional distress from intentional interference with a dead body. This label distinguishes the tort recognized in Kansas from the unrecognized Restatement tort in two ways. First, the Kansas tort requires intentional interference while the Restatement allows recovery for merely negligent interference with the dead body. Second, the Kansas tort requires emotional distress as an element. The Restatement (Second) of Torts § 868 only mentions emotional distress in comment *a* rather than the tort itself. Ultimately, the *Dana* court affirmed the trial court's summary judgment because the plaintiffs could not show that the funeral home intended to interfere with the remains. The *Dana* court also held that the emotional distress described by the plaintiffs did not rise to a level warranting recovery for intentional infliction of emotional distress. 48 Kan. App. 2d at 1062.

In Lane's appellate brief, he correctly takes from *Burgess* the name and elements of the tort. The act of interfering with the dead body must be intentional or malicious and the act must be the proximate cause of the plaintiff's mental anguish. The trial court held that Lane failed to produce sufficient evidence of intent to proceed beyond summary judgment.

Lane contends that the defendants' intent to interfere with his right to Patricia's body can be inferred from their actions. Lane supports his argument for inferring intent by reference to *Thomas v. Benchmark Insurance*, 285 Kan. 918, 179 P.3d 421 (2008). Lane correctly states the holding in *Thomas*, but incorrectly attempts to apply *Thomas* to the facts here.

In *Thomas*, our Supreme Court ruled that intent to cause injury or damage can be actual or it can be inferred from the nature of the act. Melissa Gutierrez lost control of her car while fleeing police, killing herself and her front passenger, Ramon Sanchez, and

17

injuring backseat passenger Victor Reyes. The parties agreed on Gutierrez' intentional acts, for example, speeding. 285 Kan. at 923.

The *Thomas* court stated the "intentional act" or "intentional injury" exclusion test in Kansas as follows: "The insured must have intended both the act and to cause some kind of injury or damage. Intent to cause the injury or damage can be actual or it can be inferred from the nature of the act when the consequences are substantially certain to result from the act." 285 Kan. at 933. When Gutierrez crashed, she was driving 100 miles per hour through a stop sign intersection. The *Thomas* court held that injury was "substantially certain" from Gutierrez driving the wrong way against traffic, failing to stop at a stop sign, and driving at 100 m.p.h. through neighborhoods. 285 Kan. at 935.

Lane's analogy to *Thomas* fails on the facts here. Lane has not produced sufficient evidence for the trial court to assume for summary judgment purposes that Ho, Singh, or Munoz received e-mail notifications of Patricia's death certificate. But even if the record showed or the trial court inferred that they had received notices, no evidence establishes whether they disregarded such notices intentionally.

In *Thomas*, the evidence showed (and the parties stipulated) that the driver intended to drive fast, ignoring traffic rules. Then the *Thomas* court inferred from that intentional act that the driver also intended to cause injury, which was substantially certain to result. Here, Lane would need to point to some evidence tending to show that Ho, Singh, or Munoz intentionally disregarded or deleted an e-mail notification or otherwise delayed completion of the death certificate. Then the trial court could analyze whether an intent to injure Lane could be inferred from that intentional act of delaying the completion of death certificate.

On the other hand, in *Thomas*, the intent to act was explicit and the intent to injure was inferred. Here, Lane asks us to infer an intent to act and then infer an intent to injure.

18

We conclude that the trial court correctly declined to infer more than the record would bear and properly awarded summary judgment to the defendants. A jury may not be allowed to reach its verdict based on speculation. Thus, a party cannot avoid summary judgment on the mere hope that something may develop later during discovery or at trial. Likewise, mere speculation is insufficient to avoid summary judgment. *Kincaid v. Dess*, 48 Kan. App. 2d 640, 656, 298 P.3d 358 (2013).

*Did the trial court err by granting summary judgment for lack of evidence of injury?*

The trial court granted summary judgment because Lane failed to produce evidence of intent. The defendants argue that, even if the record contained intent evidence, Lane has also failed to show emotional distress severe enough for recovery. Lane argues that severe or extreme emotional distress is not an element of the tort, and he argues that he has met the lower burden of showing emotional distress. Because Lane failed to produce evidence that the defendants acted intentionally, we decline to address the issue of injury.

*Did the trial court err by granting summary judgment for lack of causation evidence?*

In their brief, the defendants claim that the cause of delay for Patricia's death certificate was from a nonparty hospital employee assigning the death certificate to Singh. The uncontroverted facts show that this mistake caused the death certificate to be delayed from November 9, 2017, to November 14, 2017, when the funeral home called Munoz. The statutory three-day deadline had already passed before the funeral home learned from Munoz that Ho was the correct physician to complete the death certificate. But the defendants fail to address the cause of delay from November 14, 2017, when Munoz spoke to the funeral home, until November 21, 2017, when Ho completed the death certificate. But the evidence would need to show that the defendants intentionally, rather than negligently, caused this delay. Because the evidence does not show an intent

to delay completion of Patricia's death certificate, we affirm summary judgment in this appeal.

*Is Sound Physicians vicariously liable for the inactions of Ho, Singh, and Munoz?*

The defendants argue that summary judgment was correct because Lane failed to show an intent to interfere with Patricia's body. Alternatively, Sound Physicians argues that, if Ho or Singh or Munoz intentionally interfered with Patricia's body, then such interference was outside the scope of their employment. Sound Physicians argues that it should not be vicariously liable for employees intentionally or maliciously interfering with a dead body because such an act would not be in furtherance of any legitimate business interest.

As Lane correctly argues, Sound Physicians raises this issue for the first time on appeal. Issues not raised before the trial court cannot be raised on appeal. *Gannon v. State*, 303 Kan. 682, 733, 368 P.3d 1024 (2016). Also, we need not address this issue because of the lack of evidence of the defendants' intent to delay completion of Patricia's death certificate is fatal to Lane's vicarious liability claim.

*Did the trial court err by dismissing Singh under K.S.A. 2017 Supp. 40-3403(h)?*

Lane argues that the trial court erred when it dismissed Singh from the suit, ruling that K.S.A. 2017 Supp. 40-3403(h) grants him immunity. Because the trial court correctly entered summary judgment in favor of all defendants, we need not address this issue.

For the preceding reasons, we affirm.